E4NBMIRT                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TATIANA MIRONOVA,

4                 Plaintiff,

5           v.                          13 CV 1663 (TPG)

6   PASQUALE'S DAMARINO'S, INC.,
    individually doing business as
7   Da Marino Ristorante Italiano,
    PASQUALE MARINO, individually,
8   and PETER ROSSIGNUOLO,
    individually,
9
                 Defendants.
10
    ------------------------------x
11                                      New York, N.Y.
                                        April 23, 2014
12                                      10:32 a.m.

13  Before:

14                  HON. THOMAS P. GRIESA,

15                                      District Judge

16                         APPEARANCES

17  ARCE LAW GROUP, PC
         Attorneys for Plaintiff
18  W. GORDON KAUPP

19  EPSTEIN BECKER & GREEN, P.C.
         Attorneys for Defendants
20  BRIAN G. CESARATTO
    IAN G. NANOS
21
    ALSO PRESENT:
22       Robert Wisniewski, Esq.

23

24

25

E4NBMIRT                        Trial

1          (Trial resumed)

2          (In open court; jury present)

3          THE COURT:  Good morning, everybody.  We'll proceed.

4          MR. KAUPP:  Your Honor, we had a little spill of water

5  on the table.  We just need-- Mr. Beale is getting some paper

6  towels for us.

7          THE COURT:  Did it damage the table?

8          MR. KAUPP:  It doesn't appear that it has, your Honor.

9          Mr. Beale, I'm noticing there's not a remote control

10  on the lectern like there is here for what's showing on the

11  screen.  So I don't know how to put that on video mute.

12          THE DEPUTY CLERK:  We need a minute, Judge.  Okay.

13          (Pause)

14          MR. KAUPP:  I apologize, your Honor.

15          THE COURT:  Are you all set now?

16          MR. KAUPP:  We are.

17          THE COURT:  Okay.  That's fine.  Okay.  Are you going

18  to call your first witness?

19          MR. KAUPP:  Yes, your Honor.  The plaintiff will call

20  Tatiana Mironova as the first witness.

21   TATIANA MIRONOVA,

22      called as a witness by the Plaintiff,

23      having been duly sworn, testified as follows:

24          THE DEPUTY CLERK:  Please state your full name for the

25  record.

1             THE WITNESS:  Tatiana Mironova.

2     DIRECT EXAMINATION

3     BY MR. KAUPP:

4     Q.  Good morning, Ms. Mironova.  How are you?

5             THE DEPUTY CLERK:  Speak slowly.

6     Q.  Good morning.  How are you?

7     A.  I'm fine, thank you.

8             MR. KAUPP:  Your Honor, the witness left her water at

9     the table.  Do you mind if I approach and make sure she has --

10            THE COURT:  Yes, please.

11            MR. KAUPP:  Thank you.  I think it's going to be too

12    awkward leaning over the table, so when I need to show you an

13    exhibit, I'll go over to the table.  Okay?

14            THE COURT:  Of course.  Whatever's convenient.

15    Q.  Ms. Mironova, to start, I'd like to give the jury a little

16    background on you.  Can you please tell us when you were born?

17    A.  October 16, 1986.

18    Q.  And where were you born?

19    A.  Moscow, Russia.

20    Q.  And in what country?

21    A.  Well, when I was born it was Soviet Union, and then it's

22    became Russian confederation.

23    Q.  Okay.  And did you attend school in Russia?

24    A.  Yes, I did.

25    Q.  Where did you attend high school?

1   A.  Yes, I did.  I went to Moscow school.  We have numbers.  We

2   don't have names.  It's 1130.  And I was studying geography in

3   high school.  And before that I was studying mathematics,

4   economics and informatics.

5   Q.  Is there one subject that you excelled at or preferred over

6   the others?

7   A.  Yes, I was-- I was good at mathematics.  And, you know, it

8   was extensive study, like advanced classes.

9   Q.  And outside of the academic curriculum, did you have any

10  other activities that you did in school?

11  A.  Well, I finished ballet school, from 7 to 14, and

12  graduated.  I also --

13          THE COURT:  I think maybe if you could speak a little

14  louder.

15          THE WITNESS:  No problem.

16          THE COURT:  And just take your time a little bit so

17  the jury hears you very clear.

18          THE WITNESS:  Okay.  Sorry.

19  A.  So I finished the ballet school.  And in high school I

20  played volleyball.  Was team leader, I think it's called.

21  Q.  And did you graduate high school?

22  A.  Yes, I did.

23  Q.  And when was that?

24  A.  June 2004.

25  Q.  And did you have any post-high school education?

E4NBMIRT                    Mironova - direct

1   A.  Yes, I did.

2   Q.  And can you tell us, what did that consist of?

3   A.  Well, when I graduated high school, my mother got sick and

4   I had to skip-- I missed the classes, the examination for the

5   universities that I wanted to go.  She was fine, you know, in a

6   month, and I passed the exams for two universities.  One of

7   them was financial and another one, international law and

8   trade.

9   Q.  And how many years would it take to complete the

10  international law and trade program?

11  A.  Five years.

12  Q.  Okay.  And at some point you came to the United States, is

13  that right?

14  A.  Yes, I did.

15  Q.  And when was that?

16  A.  It's June 2007.

17  Q.  And how much of the law and trade program had you finished

18  at that point?

19  A.  Three years completed.

20  Q.  Finished three and you had two more to go?

21  A.  Yeah.  Well, in first two we studied general studies, like

22  geography, mathematics, rhetorics, logic.  Only one year we

23  studied Russian law, like labor law or-- I don't know, just

24  general law.  Very general.

25  Q.  Any other topics of law?

1   A.  Civil, constitutional, of Russia.  Not that I remember

2   right now.

3   Q.  Okay.  And prior to coming to the United States, did you

4   plan on completing that program?

5   A.  Of course.

6   Q.  And why did you come to the United States in the summer of

7   2007?

8   A.  Well, that was my second trip aboard.

9   Q.  Abroad?

10  A.  Abroad, I'm sorry.  Abroad.  My friend, he asked, you

11  know-- we just want to go on a vacation.  He said that there is

12  a program in the United States, like a student-- international

13  student.  It's basically international student come to the

14  United States for work and just, you know, vacation.

15  Q.  And so you came to do work and study?  I didn't --

16  A.  Well, you know, the program is you apply to a company and

17  they find you a job offer in the United States.  They buy you

18  ticket and you apply for a visa.  So when you come in, you have

19  to go to your employer and work.  So they were find-- you know,

20  they found me job as a waitress in Virginia.  They did not

21  provide the living or nothing.  They just provided you a job

22  offer.

23          Well, when I came to United States, I had no idea this

24  is company-- I didn't know, you know-- when I came in, there

25  were no such company.  I basically was on my own.  When they

1   needed this company, they took the money from Russian students,

2   we come in and then we're on our own.  You know, this company

3   never existed.

4   Q.  So you applied through a program --

5   A.  Applied through a program.

6   Q.  Can you tell me about the visa that you came on?

7   A.  Yes, that was J-1 visa.  Basically you have to-- this is

8   like working visa.  You work for three months and you have,

9   like, two weeks for your own time, vacation, and then you go

10  back to Russia.

11  Q.  When you came, did you try to find the company that you

12  were supposed to work for?

13  A.  Yeah, of course.  I tried to contact them, but there were

14  no such company.  I came to New York.  I had to-- I had to go

15  to Virginia in ten days.  Well, when I came, you know, there

16  were no such company.

17  Q.  And so where did you stay when you came?

18  A.  I met a girl at one of the meetings.  With that program I

19  met a girl, and she had a girlfriend or, like, her parents had

20  a daughter who lived in United States-- no.  Her parents had a

21  friend, friends, and this friend's daughter lived in United

22  States.

23         So, you know, they gave her her address and they were

24  talking and this girl said that we can stay at her house.  And

25  because this girl didn't want to go by herself and she invited

1   me.

2   Q.  And where was her house?

3   A.  It was in Kings Highway.  Kings Highway, Brooklyn.

4   Q.  And do you remember what month you came in 2007?

5   A.  Yeah, June 4th.

6   Q.  June 4th.  And how long were you planning on staying?

7   A.  Three months.

8   Q.  Okay.  And then at some point you met your future husband,

9   is that right?

10  A.  Yes, I did.  Well, when I came, lucky for me the girl even

11  picked up the phone.  You know, she wouldn't pick up the phone,

12  I would be sleeping outside.  So she picked up the phone.  I

13  came to this address, because I didn't have even an address,

14  you know.  I just had phone number of this girlfriend that saw

15  once before.  It's kind of crazy.

16          Anyway, I came to this apartment and she-- the airline

17  lost her luggage.  So we were staying at-- we were staying in

18  her apartment for three days because -- you know, waiting for

19  luggage to be delivered.  And after that we got the luggage, we

20  went to the beach, Brighton Beach.

21  Q.  And what happened at Brighton Beach?

22  A.  Well, my girlfriend like my future husband.  And I tried to

23  help her to, you know, kind of, like, meet, I guess.  You know,

24  she pointed him out and he was looking at us.  And he came to

25  me and he asked me to watch his stuff, to watch his Prada

1    glasses and phone.  And I was very surprised.  First of all, he

2    spoke Russian, and for me it was very, very strange that

3    somebody in America speak Russian and especially give me his

4    belongings, like glasses or phone.  In Russia, you give

5    somebody your stuff, you'll never see them again.  Well, that

6    surprise me.  That's how we met.

7    Q.  And fast-forward about eight months and you two ended up

8    getting married?

9    A.  In eight months.

10   Q.  When were you married?  What day?

11   A.  It's March 19, 2008.

12   Q.  Okay.  And where did you do that?

13   A.  Queens City Hall.

14   Q.  And yesterday counsel mentioned that none of your husband's

15   family was there.

16           Could you please tell us why your husband's family

17   wasn't at your wedding?

18   A.  Well, that was my decision because my family not here, even

19   today.  My sister was under age.  My mother is still in Russia.

20   My father's still in Russia.  It's kind of not fair that his

21   family will be, you know, at our wedding and my family will

22   not.

23           And we decided that-- and my husband told me that this

24   is kind of like general proceeding.  It's not like in Russia

25   it's very-- it's music, you walk in and everybody congratulate

1    you and flowers.  It's just-- it's just different.

2            And we agreed that we would have a wedding in church

3    and then we will invite his family and my family and this will

4    be big party, you know.  We were just, you know...

5    Q.  So if I'm understanding you correctly, you wanted to do

6    just the civil ceremony and then later you planned on doing a

7    big celebration, a wedding at a church with both families?

8    A.  That's correct.

9    Q.  Okay.  Has that happened yet?

10   A.  Unfortunately, not yet.

11   Q.  And why not?

12   A.  Because-- because all this lawsuits and just that's how.

13   Q.  Are you still planning on doing that one day?

14   A.  Of course.  This is-- hopefully will happen soon.

15   Q.  Okay.  And then can you tell us at some point did you start

16   to attend school in the United States?

17   A.  Yes, I did.  Actually --

18   Q.  Where did you attend?

19   A.  In September 2007, in three months I went to Manhattan

20   College.

21   Q.  And what did you study there?

22   A.  I studied telecommunications concepts, computer science.

23   Q.  Okay.  And for how long did you attend that school?

24   A.  Only one semester because then it was kind of rough.  It

25   was money.  I came here.  We save a hundred dollars and you

1    know how fast it can go.  My husband was attending Stony Brook

2    University and he was about to become a doctor.  And he was

3    about to go to medical school.  So, well, I was-- I had to go

4    to work.

5    Q.  Okay.  And where did you work?

6    A.  At the beginning I was working in Brighton Beach, in

7    Russian-- because I had no experience in waitressing or

8    hospitality.  So I went to Russian place and I worked in

9    Brighton Beach.  I worked seven days, seven days a week, from

10   11 to 1 a.m.

11   Q.  11 a.m.?

12   A.  11 a.m. to 1 a.m. seven days a week.  It was very hard.

13   Q.  And where did you work?  What was the name of that place?

14   A.  Gina's Cafe Cappuccino.  That's the name.

15   Q.  And then at some point did you go back to school?

16   A.  Of course.  Yes, I did.

17   Q.  And when was that?

18   A.  2011.

19   Q.  Okay.  And where did you go in 2011?

20   A.  I went to Kingsborough Community College in Brooklyn.  I

21   graduated with honors in computer information systems.

22   Q.  And why did you study computer information systems?

23   A.  Well, most of my life, all my junior school and elementary

24   school, I was studying mathematics and I was very good at it.

25   We were studying programming and it was advanced classes.  And

E4NBMIRT                          Mironova - direct

1   I was always good at it.

2   Q.  Okay.  And just slow down a little.

3   A.  I didn't realize that I'm talking-- sorry.

4   Q.  It's okay.  It's okay.

5           And are you still in school?

6   A.  Yes.  I'm graduating this May with bachelor degree in

7   computer science.

8   Q.  Okay.  And are you involved-- other than your academic

9   studies, are you involved in any other activities outside of

10  your academic curriculum?

11  A.  Sure.  I was elected as senior senator in student

12  government in my college in Staten Island.  I did a lot of

13  volunteering jobs, especially for an organization called All

14  Hands.  It's volunteering organization that helps people whose

15  houses were destroyed.  So I was participating in this

16  organization.

17          And, also, I created my own projects which helped

18  students with their academics and just student services.  So if

19  any students have problems, they would come to me and I would

20  help them.  And I will advise them because I had to-- I made

21  mistakes when I was in Kingsborough Community College.  I took

22  classes that I didn't have to and I didn't know.  And I just

23  wanted other people not to do the same mistake that I did.

24  Q.  Okay.  And at some point-- prior to graduating, did you try

25  to get work doing computer work?

1   A.  Well, of course.  During the college I also was granted by

2   school, was grant.  Was working two independent projects.  I

3   was creating software for-- was image processing technology.

4   What it does, we had the telescope and I take pictures of

5   constellations.  And my job was create the software that

6   analyzes the data and basically telling you what kind of

7   constellation it is.

8        And another project that I done, I was hired by a

9   research foundation, CUNY Research Foundation.  And I created a

10  robot snake, artificial intelligence.

11  Q.  Okay.  And other than that, did you try to make any money

12  doing any computer work?

13  A.  Yes.  In 2008 the lady that helped me with my papers when I

14  applied for citizenship, she told me that she has friends who

15  own the company and they had some problems, issues with their

16  computers and they have some kind of-- they needed some kind of

17  maintenance.  So she-- but they were-- they said that they--

18  the job is for 1099.  So for that I had to be independent

19  contractor and I had to open my business.

20  Q.  Okay.  Let me stop you--

21  A.  A company.

22  Q.  Let me stop you right there.  I'm going to change locations

23  to put something up.

24       MR. KAUPP:  Counsel, I'm going to be referring to

25  Defendants' Trial Exhibit 3.

1          And the Court, your Honor, I'll be referring to

2     Defendants' Exhibit 3.

3          THE COURT:  All right.

4     Q.  Ms. Mironova, at some point you mentioned opening or being

5     advised to open your own company for purposes of a 1099.  Is

6     that right?

7     A.  Yes.  Yes.

8     Q.  Okay.  I'll ask you to look in the black binder up there.

9     Do you have a black binder?

10          MR. KAUPP:  Your Honor, may I approach the witness?

11     Thank you.

12     Q.  Ms. Mironova, I'll ask you to turn to Defendants' Exhibit

13     3.  Just pull back the number 3 tab and look at the second page

14     of the exhibit.

15     A.  Okay.

16     Q.  Do you recognize this document?

17     A.  I do.

18     Q.  Okay.  And do you see your signature on this document?

19     A.  I do.

20     Q.  Could you tell us what this is?

21     A.  This is a business certificate that this lady opened--

22     basically business that she opened for me.  I give her my

23     authorization to do that.  She went to court and she opened to

24     me-- for me.

25     Q.  Okay.  And does this appear to be an exact copy of the

1   business certificate that you used to open your company?

2   A.  It is.

3   Q.  Okay.

4           MR. KAUPP:  Your Honor, at this time I'll ask to move

5   this exhibit into evidence.

6           THE COURT:  Received.

7           MR. KAUPP:  May I publish it to the jury?

8           (Defendants' Exhibit 3 received)

9   Q.  Okay.  Just reading it, it says "I hereby certify that I am

10  conducting or transacting business under the name or

11  designation of TMZ Company Tatiana Mironova."

12          Do you see that?

13  A.  I see.

14  Q.  And that's the company you opened to do computer consulting

15  work.  Is that right?

16  A.  Yes, that's right.

17  Q.  Okay.  And so tell us, did you do computer consulting work

18  for this --

19  A.  I did.

20  Q.  What did you do?

21  A.  Well, this was just like a one-time job.  What I had to do

22  is just meet-- they had some problem with computers and they

23  needed update and they needed maintenance.  Also just cleaning

24  some viruses and -- you know.

25  Q.  And for how long did you do that work for this company?

1   A.  Well, I had to come in a few times, but, you know, not

2   long.  Like a month.

3   Q.  Okay.  And is that the extent of what TMZ Company Tatiana

4   Mironova is?

5   A.  Yes, it is.

6   Q.  And I know I'm jumping ahead a little bit, but at some

7   point did DaMarino's Restaurant pay you checks that were titled

8   "TMZ Company Tatiana Mironova"?

9   A.  Yes, they did.

10  Q.  I'll now direct your attention to Defendants' Trial Exhibit

11  4 in the same binder in front of you.  Please review Defense

12  Exhibit 4.  It's a few pages.  It's DaMarino 000032 through

13  DaMarino 0045.  Please take a moment to look through these

14  documents.

15          Do you recognize what those are?

16  A.  I do.

17  Q.  And what are they?

18  A.  Well, this is personal checks from Pasquale Marino that he

19  pay me shift pay.  And then I also see my company name over

20  here.

21  Q.  Okay.  Do these appear to be exact copies of the checks you

22  received from Pasquale Marino?

23  A.  I think so.

24          MR. KAUPP:  Your Honor, at this time I'll move

25  Defendants' Trial Exhibit 4 into evidence.

1              MR. CESARATTO:  No objection, your Honor.

2              MR. KAUPP:  Your Honor, I'd like to move Defendants'

3   Trial Exhibit 4 into evidence.

4              THE COURT:  Received.

5              (Defendants' Exhibit 4 received)

6              MR. KAUPP:  Thank you.  May I publish them to the

7   jury?

8              THE COURT:  Of course.

9   Q.  Tatiana, I'm looking at what's Bates marked DaMarino 0032.

10  Can you look at that in the binder?

11  A.  Yes, I see.

12  Q.  Can you tell me what this is?

13  A.  As I said, this is a check that Marino gave me for my shift

14  pay.  Shift pay, right?  I'm saying it right?

15  Q.  Shift pay?

16  A.  Yes.

17  Q.  Yes.  And what is shift pay?

18  A.  Well, shift pay is, like, regular-- normally people get

19  minimum wage and --

20  Q.  Tatiana, hold on.  I'm going to stop you right there.

21             MR. KAUPP:  I'll move to strike that answer, your

22  Honor.

23             Is there any objection?

24             MR. CESARATTO:  No objection.

25             MR. KAUPP:  Your Honor, I move to strike that answer

1   with no objection from defendants.

2                THE COURT:  Proceed.

3                MR. KAUPP:  Thank you.

4   Q.  Just please describe what you are being-- what shift pay

5   is.  How were you paid?

6   A.  Fifty dollars per day.

7   Q.  Okay.  And this check is for $200?

8   A.  Yes, but that's means that's four days.

9   Q.  Okay.  Now, how did it come about that Pasquale's

10  Damarino's, Inc. was paying you to TMZ Tatiana Mironova?

11  A.  Well, I-- okay.  Mr. Marino paid us from a certain account.

12  For example, I was in charge of all the money that were in

13  DaMarino.  Not only me.  All the bartenders had to do with all

14  the checks, all the cash checks.  Not the credit cards, just

15  the cash checks.

16            So, for example, he makes certain amount of cash and

17  he-- I put it in a box that he picks up in the morning.  He

18  goes shopping and whatever he does not spend, he-- from my

19  understanding, he deposited to his account.

20            So sometimes I'm on-- he can't have enough money to

21  pay the employees, so he delayed our paychecks for two weeks or

22  three weeks or a month.  And especially he would do-- he would

23  make a paycheck but he would not give it to us.  Either Izabela

24  or Pasquale -- he would say-- Pasquale would say, Come to

25  Izabela; Izabela would say, Come to Pasquale, I can't give you

1    a check.  You know, we didn't want to bother-- we didn't want

2    to bother him too much because we were afraid to lose a job.

3            So at one point he ask me if he can pay me in personal

4    checks.  He's like I can't-- I don't have-- like, it was like

5    summertime.  He said the business is slow, I can't pay you

6    right away.  Do you mind if I pay you a little later in

7    personal checks?

8    Q.  Okay.  Did you ask him to pay you to TMZ Tatiana Mironova?

9    A.  I never asked him to pay TMZ Tatiana Mironova because the

10   TMZ is an independent contractor which is 10-- which is 1099

11   and it's consulting services about the computers.  I was a

12   bartender.  What kind of consulting services with computers?

13   We didn't even have a computer.  We only got a computer after I

14   came back from car accident.

15   Q.  Okay.

16   A.  And everything was in cash register.

17   Q.  We'll get there.

18   A.  Okay.

19   Q.  When did you first-- at some point did you tell Pasquale

20   Marino about TMZ company?

21   A.  I think he learned about it during my interview.

22   Q.  Your interview when you first got hired?

23   A.  Yes.

24   Q.  At some point did you learn-- I'll back up a little bit.

25           At some point did you learn that DaMarino's Restaurant

1   was hiring?

2   A.  Yes.

3   Q.  And how did you come to learn that?

4   A.  Well, I was looking for a job and I was looking through

5   Craigslist and one of the ads was DaMarino's.  And his ad

6   required resume and pictures, body picture and head shot.  So I

7   responded to-- I responded to bunch of ads, not specifically,

8   you know, just DaMarino, some of them.  The ones who ask for

9   pictures, I included the pictures.  Some of them, most of them,

10  did not ask for pictures at all.

11  Q.  Okay.  And you came to apply to a job at DaMarino's, is

12  that right?

13  A.  Well, I received a call from --

14  Q.  I'm not there yet, Tatiana.

15  A.  Okay.

16  Q.  I'm going back.  You just told us that you sent an

17  application to DaMarino's.

18  A.  Yes, I did.

19  Q.  And tell us, again, what did your application consist of?

20  A.  The application, just the response was my resume and the

21  pictures.

22  Q.  Okay.

23  A.  My head shot and body shot picture.

24  Q.  Okay.  I'll ask you to refer to Defendants' Trial Exhibit

25  2.  It's a four-page document.  Please review the four pages.

1          Do you recognize what that is?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  Well, first page is my resume, and second part is a

5    continue-- like second page of my resume.  Page number three

6    and four is pictures that I guess I applied with.

7    Q.  Does this appear to be the application you sent to

8    DaMarino's?

9    A.  Yes.

10         MR. KAUPP:  At this point, your Honor, I'd like to

11   move Defendants' Trial Exhibit 2 into evidence.

12         MR. CESARATTO:  No objection, your Honor.

13         THE COURT:  Received.

14         (Defendants' Exhibit 2 received)

15         MR. KAUPP:  May I publish it to the jury, your Honor?

16         THE COURT:  Of course.

17         MR. KAUPP:  Just one moment.  The image is not coming

18   up.

19         MR. CESARATTO:  Your Honor, plaintiff's counsel is

20   scrolling through documents that are not in evidence.  I would

21   be happy to put up the resume for him without publishing it to

22   the jury.

23         MR. KAUPP:  And you know what I just realized?  What I

24   can do is in the box --

25         THE COURT:  What's the exhibit in question?

E4NBMIRT                        Mironova - direct

1              MR. CESARATTO:  Well, Judge, the exhibit's in

2      evidence.  It's just that Mr. Kaupp is scrolling through

3      documents that are not in evidence that are being seen by the

4      jury.  We're happy to put it up for him.

5              THE COURT:  Let's not spend time on mechanics.  Just

6      let's get through this somehow.

7              MR. CESARATTO:  Okay.

8              MR. KAUPP:  Thank you, your Honor.

9      BY MR. KAUPP:

10     Q.  Okay.  Ms. Mironova, starting with the first page of

11     Defendant's Exhibit 2, what is this?

12     A.  This is the resume that I applied to DaMarino.

13     Q.  Okay.

14             THE COURT:  It's the what?

15             THE WITNESS:  Resume that I applied to DaMarino.

16             THE COURT:  Okay.

17     Q.  And at the top here, can you tell us what is the purpose of

18     your resume?

19     A.  Well, I was trying to find a bartender or waitress job.

20     Q.  Okay.  And then under "experience," what's the experience

21     that you listed?

22     A.  I listed that I worked at Maxies Restaurant, Hawaiian

23     Tropic and Explore Talent.

24     Q.  Let me ask you, was this the first resume that you-- well,

25     strike that.

1              How did you come to put this resume together?  What

2     did you do to create this resume?

3     A.  Well, I had, you know, no idea how to create resume,

4     resumes, at all.  That was just my best attempt at that time.

5     Because in Russia I did work, but, like, I did not-- I did

6     different kind of a work.  We didn't-- I didn't have to create

7     the resume or something like that.

8              So I saw that I will summarize my experience, and I

9     put, you know-- I put --

10    Q.  I'm asking you, how did you learn to make your resume?

11             THE COURT:  Is that really necessary?

12    A.  What do you mean?

13             MR. KAUPP:  Well, your Honor, I'm sorry, but I think

14    the defendants are going to spend quite a bit of time on this

15    document and so I'd like for her to explain the resume to the

16    jury.

17             THE COURT:  All right.

18    A.  Well, I looked at the samples online and, you know, copied

19    some stuff.

20    Q.  Okay.  And, briefly, you mentioned Maxies, Roxy, Hawaiian

21    Tropic Zone.

22    A.  Uh-huh.

23    Q.  Can you tell us what Explore Talent is?

24    A.  Explore Talent is a scam company for people who wants to

25    become an actress or model.  And what they do, they create a

1    meeting.  When you come in, you bring the pictures.  They have

2    a meeting, they explain you, they tell you, they promise you,

3    oh, you gonna be superstar.  Basically, you know, they trying

4    to brainwash you and then they ask for money to-- they say, oh,

5    you pay us $500 and we give you jobs.  You know, they basically

6    like a middleman.

7          Well, I were to give them pictures, you know.  I took

8    the information and I just left.  You know, they created the

9    website for me, you know, which I learn later-- I just saw-- I

10   just saw-- oh, they send me business cards with my picture,

11   which I never used.  That's what Explore Talent is.

12   Q.  And under Explore Talent-- so is it your understanding it

13   was a model agency?

14   A.  No, that's not a modeling agency.  I thought that's a

15   modeling agency when I came in.  But when I came in and I went

16   through the whole meeting, I realized it was just a scam.

17   Because my husband said if you have to pay something, that's

18   not real.

19   Q.  Okay.  And under Explore Talent you put "Model January '04

20   to present time"?

21   A.  Yes, I did.

22   Q.  And what does that refer to?

23   A.  Just a-- well, I didn't consider myself a model because for

24   me modeling is when you-- when you start young and you do and

25   you learn how to walk.  It was just a summary-- like a summary.

E4NBMIRT                         Mironova - direct

1    I just wanted to summarize, you know, just things, the work

2    there I've done.

3    Q.  You put down "Photo shoots and runways."

4            Had you had any experience with photo shoots and

5    runways?

6    A.  I did the photo shoots for myself.  I never got paid for

7    that.  I just wanted to have some pictures.  And my friend,

8    she's a stylist and she just said that her friend is a

9    photographer.  Not professional, just-- and he need some

10   pictures.  This was just, like, a common interest.  And I

11   wanted some pictures; he wanted some training, I guess.

12           And I did some runways, but it was --

13   Q.  Slow down.  Slow down with your talking.  Okay?

14   A.  Sorry.

15   Q.  Now, tell us about the runway experience.

16   A.  So, runway I did basically-- I worked for the designer.

17   And all the money that were made from that, they went to

18   children who suffered the hurricane in Haiti.  So basically you

19   walk, people like what you wear, they buy it, and that money

20   goes to children in Haiti.

21   Q.  In Haiti?

22   A.  Yeah.  And it was sponsored by Red Cross, Red Bull.

23   Q.  Where was that?

24   A.  In Manhattan.

25   Q.  Okay.  And then you put down-- I'm sorry, I skipped ahead.

1          You put down your Institute of International Trade and

2    Law education?

3    A.   Yes.

4    Q.   Okay.  And some computer experience.

5          And then "About me," could you read that for us?

6    A.   "I am very energetic, outgoing, friendly, smart and

7    good-looking person.  I love to work, and I am looking for an

8    interesting job.  I know how to sell, talk to the customers, et

9    cetera."

10   Q.   And why did you-- why did you write these things on your

11   resume?

12   A.   Well, I copied that from somewhere.  I saw it, you know.

13   At that time I thought is a good idea because-- I don't know.

14   I felt like a lot of people, the main criteria they hire young

15   girls is how do-- because how they look, you know.

16   Q.   Did you have any prior experience that you felt like your

17   looks were important to getting a job?

18   A.   I certainly did.

19   Q.   Tell us about that.

20   A.   Well, when I worked back to Maxies, Maxies is-- I work--

21   like before Maxies, I work at Roxy, which is the same company,

22   the same owner.  And I work there as a waitress.  I-- I got,

23   you know-- the manager hired me and then I got transferred to

24   Maxies.  I work as a bartender.  And I believe that the only

25   reason I got the job is because how I looked.  The manager, he

E4NBMIRT                         Mironova - direct

1  was making inappropriate comments, you know.

2  Q.  What about the other women that worked there?

3  A.  They were Eastern European, Russian immigrants, the same as

4  me.

5  Q.  And were they attractive women?

6  A.  Of course.  I don't know.

7  Q.  And then I'm going to go down to the end, the last two

8  pages of your application to DaMarino's.  This third page, what

9  is this a picture of?

10 A.  This is a picture of me.

11 Q.  Okay.  And was this-- earlier you described a photo shoot

12 that you did for yourself.

13         Is this part of the photo shoot?

14 A.  Yes.  This is pictures for my husband and for me.  I wanted

15 to have some pictures.

16 Q.  Okay.  And the second one, too?

17 A.  The second one, too.

18 Q.  Now, you came to-- after you applied to DaMarino's, what

19 was the next thing that happened after you sent in your

20 application?

21 A.  After that I received a call from Simoné and he said-- he

22 introduced himself that he's a manager and that he's from

23 DaMarino.  And then Marino, I guess, took the phone from him in

24 the middle of conversation and he said "Oh, Bella, I saw your

25 pictures and I liked it very much."  I said "Okay."  And he

E4NBMIRT                        Mironova - direct

1    was, like, "Oh, do you want to come in for the interview?  Are

2    you looking for a job?"  I said "Yes."  And he said, "All

3    right.  When you come in?"  And I said-- I don't know when I

4    said.  I said then, you know.  I indicated day.  And he's,

5    like, "All right.  We have an interview that day.  You come in,

6    you know, that time."

7    Q.  Okay.  And then so you went in for an interview?

8    A.  I went for an interview, yes.

9    Q.  Okay.  And could you please describe-- tell us about the

10   interview, but please don't give too long of a response.  We'll

11   do this in steps.  Okay?  So tell me the first thing you

12   remember about the interview, the first thing happening.

13   A.  Well, when I came in, it was a lot of girls because they

14   were having for server, hostess, and the bartender position.

15   And I sat at the bar.  And when my turn came, I went in the

16   back where I met Peter Rossi and Marino.

17   Q.  Okay.  And when you say "the back," you're talking about

18   what?  You know, actually, would you please describe the layout

19   of the restaurant for us so we all have a sense?

20   A.  Sure.  When you came in-- the place is kind of in the

21   basement, so you have to go down.  And on the right side you'll

22   see the bar, a long bar.  Like in the middle of the bar it's a

23   wall and it's a space behind the wall where is three tables.

24   And the whole wall is a mirror.  So you can go straight and

25   you'll see a piano.  After the bar, you'll see piano.  You'll

1    see a round table.  And then you're going a little further,

2    you'll see on the right side the waitress room and it's like an

3    opening over here.  And in the left side is liquor room and

4    coffee station.

5            So basically it's like an opening and right in front

6    of you is a rest room.  So right next to the rest room there

7    were two tops, where they can combine it.  It was like four

8    tops.

9    Q.  Four what?

10   A.  Four tops.

11   Q.  What are --

12   A.  Two tables, like two tops.

13   Q.  A four-top, like a table with four seats?

14   A.  Yes.

15   Q.  And a two-top, like a table with two seats?

16   A.  Yes.

17   Q.  Okay.  Let me stop you there.  You worked at DaMarino's for

18   how long?

19   A.  From-- I don't know for how long.  From September 2009 till

20   December 2010.

21   Q.  And you had been to that restaurant over a hundred

22   occasions, would you say, to work?

23   A.  Oh, yeah.

24   Q.  Okay.  And you're very familiar with the layout of the

25   restaurant?

1   A.  Yes.

2   Q.  Okay.

3           MR. KAUPP:  Your Honor, I'd like to show-- I'm showing

4   counsel what will be marked for identification as 52A.

5           MR. CESARATTO:  I have no objection to the photos,

6   either photos.

7           MR. KAUPP:  Your Honor, I'd like to show this to the

8   witness.  I'd like show this to the witness, your Honor.

9           THE COURT:  Of course.

10  Q.  Tatiana, do you recognize what's been identified as

11  Plaintiff's Exhibit 52A?

12  A.  Yes.

13  Q.  Okay.  And what is it?

14  A.  This is entrance to DaMarino.

15  Q.  Okay.  And does this look like a fair and accurate

16  representation of the entrance to DaMarino's?

17  A.  I think, yes.  The layout a little changed.  The flowers

18  always change.

19  Q.  But is this fair and accurate representation?

20  A.  Of course, yes.

21          MR. KAUPP:  Your Honor, at this point I'll move 52A

22  into evidence.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 52A received)

25          MR. KAUPP:  May I publish it to the jury, your Honor?

```
 1              THE COURT:  Yes.  Does the jury have anything on your
 2   screens?
 3              A JUROR:  No, your Honor.
 4              MR. KAUPP:  There's nothing on the screens, your
 5   Honor.
 6              THE COURT:  Okay.  We're waiting.
 7              MR. KAUPP:  I'm showing counsel what's been marked for
 8   identification purposes as 52B.
 9              MR. CESARATTO:  Yes.
10              MR. KAUPP:  Your Honor, may I show this to the
11   witness?
12              THE COURT:  Sure.
13   BY MR. KAUPP:
14   Q.  Ms. Mironova, can you please tell us what this is?
15   A.  This is a bar where I worked.
16   Q.  At DaMarino's Restaurant?
17   A.  At DaMarino's Restaurant, yes.
18   Q.  Is this a fair and accurate representation of the bar when
19   you worked there?
20   A.  Well, the register changed, the location, but the layout is
21   the same.
22   Q.  Okay.  And did it look like this, other than the register,
23   when you worked there?
24   A.  Yes.
25              MR. KAUPP:  Your Honor, I'll move this into evidence.
```

1            THE COURT:  Received.

2            (Plaintiff's Exhibit 52C received)

3            MR. KAUPP:  May I publish it to the jury?

4            THE COURT:  Of course.

5            MR. KAUPP:  I'm showing what's been marked as

6    Plaintiff's Exhibit 52C to counsel.

7            MR. CESARATTO:  Yes.

8            MR. KAUPP:  May I show it to the witness?

9            THE COURT:  Yes.

10   Q.  Do you recognize this?

11   A.  Yes.

12   Q.  And what is it?

13   A.  This is-- it looked a little different before, I think.

14   There's more tables now.  But that's if you stand, face the

15   entrance, you know.

16   Q.  Is this the inside of DaMarino's Restaurant?

17   A.  Yes.

18   Q.  And other than the amount of tables changing, is it a fair

19   and accurate representation of the inside of the restaurant?

20   A.  It is.

21           MR. KAUPP:  Your Honor, I'll move it into evidence.

22           THE COURT:  Received.

23           (Plaintiff's Exhibit 52C received)

24           MR. KAUPP:  May I publish it to the jury?

25           THE COURT:  Yes.

1    Q.  And on 52C, do you see where the interview took place?

2    A.  No.

3    Q.  Okay.  Now, you discussed the layout of the restaurant, but

4    we hadn't yet gotten to the interview.  So you talked about a

5    lot of girls there.

6            How many women were there when you arrived for the

7    interview?

8    A.  More than ten.

9    Q.  Okay.  And where did you see them in the restaurant?

10   A.  Most of them were sitting at the bar.

11   Q.  Okay.  And when you arrived, what did you do?

12   A.  Sat at the bar with them.

13   Q.  And what was happening when you were sitting at the bar?

14   A.  Well, I ask "Whose turn?"  And we were basically, you know,

15   arranged between who comes first, who comes second.

16   Q.  And did you observe any interviews taking place when you

17   were sitting at the bar?

18   A.  Yes.  And most of the girls were Russian and, you know, or

19   Eastern European, so we spoke Russian.

20   Q.  So you were speaking Russian at the bar with the women who

21   were waiting to be interviewed?

22   A.  Yes.  Not all of them were Eastern European, just most of

23   them.

24   Q.  Okay.  And did you see where the interviews were taking

25   place?

1   A.  Yeah, of course.  Yeah.

2   Q.  And who was conducting the interview?

3   A.  Peter Rossi and Pasquale Marino.

4   Q.  And Peter Rossi and Pasquale Marino are in court this

5   morning, is that right?

6   A.  Yes.

7   Q.  And they're sitting at the defense table?

8   A.  Yes.

9   Q.  And the individual all the way to the right is?

10  A.  Peter Rossi.

11  Q.  Okay.  And seated to his left?

12  A.  Marino.

13  Q.  Who?

14  A.  Pasquale Marino.

15  Q.  Okay.  Now, at some point it came time for your interview,

16  is that right?

17  A.  Yes.

18  Q.  Okay.  Please tell us about the interview.

19  A.  Well, I came to the table, I sit down and give my resume.

20  You know, I tried to explain them I really needed the job.  So

21  I tried to show them that I have lot of experience and that I

22  need a job.  So I was telling them that I worked at Maxies and

23  I worked as a bartender.  They asked for what position I came

24  for.  Peter Rossi asked me what position I came for and he ask

25  if I have an experience.  I said yes.

1          He said, What else you did?  And I also told-- that's

2    the time when I told them about the TMZ.  I said I was working

3    as a consulter and I had my own company.

4          THE COURT:  You told him what?

5          THE WITNESS:  I said that I worked as a consulter for

6    the company, that I have my company, TMZ.

7    Q.  This is the computer consulting services you described

8    earlier?

9    A.  Yes, I did.

10   Q.  Okay.  Thank you.

11   A.  I just wanted them to see that I have an experience.  I

12   really wanted the job.

13   Q.  I'll stop you for a moment and ask -- you said you really

14   wanted the job.

15          Prior to applying at Marino's, what was your job

16   situation?

17   A.  I work, like, few days in a place called Avion.

18   Q.  Was it full time or part time?

19   A.  No.

20          THE COURT:  No, no.  Were you unemployed?

21          THE WITNESS:  No.

22          THE COURT:  What?

23          THE WITNESS:  No.  Well, it's probably part time.  I

24   worked at the club.

25   Q.  How many days a week were you working at Avion?

E4NBMIRT                          Mironova - direct

1    A.  One.

2    Q.  Okay.

3    A.  Sometimes.  Not -- not every week.

4              THE COURT:  What was your work?

5              THE WITNESS:  Bartender.

6              THE COURT:  A bartender.  All right.

7    Q.  Okay.  And tell us more about the interview.  What happened

8    after you described your work experience?

9    A.  Then Marino interrupted Peter and he said "She's good

10   enough."

11   Q.  Did Mr. Marino ask you any questions about your resume?

12   A.  Not about my resume, just about my private life.

13   Q.  Did Peter Rossi, Rossignuolo, ask you any questions about

14   your resume?

15   A.  No.  After Marino interrupted him, Marino was asking

16   questions and making comments.

17   Q.  And you said that Mr. Marino said that "She's good enough."

18   What happened after that?

19   A.  Well, you know, he said that I'm pretty.  He asked me if I

20   can open a bottle of wine.  You know, I said of course.  And he

21   said "All right, Bella" --

22             THE COURT:  You know, I'm really not hearing this very

23   well.

24             THE WITNESS:  I'm sorry.

25             THE COURT:  Maybe the jury is not either.  Now, let's

E4NBMIRT                        Mironova - direct

1    slow down and speak as plainly as you can.

2              MR. KAUPP:  Can you hear?

3    Q.  Okay.  We'll just take it slow and easy, okay?

4    A.  I'm just --

5    Q.  I know you're trying your best.

6              Okay.  So were there any other discussions while you

7    were being interviewed by Mr. Rossignuolo and Mr. Marino?

8    A.  No.  No, Marino asked me to wait at the bar.

9    Q.  Okay.  And did you?

10   A.  I did.

11   Q.  Okay.  And after you waited at the bar, what happened?

12             THE COURT:  He asked you to do what?

13             THE WITNESS:  He asked me to sit down at the bar.

14             THE COURT:  Okay.

15   Q.  And what happened after you were sitting at the bar?

16   A.  I saw that some girls were leaving and some girls --

17             THE COURT:  You saw that some girls were?

18             THE WITNESS:  Leaving.  You know, after the interview

19   they were just leaving the place.

20             THE COURT:  Leaving.

21             THE WITNESS:  Leaving, yeah.

22   A.  And then some of them stayed with me.

23   Q.  Okay.  And then what happened?

24   A.  And then so he spoke-- well, at the end it's only me and

25   another girl stayed.  Her name is Kess and she was also

1  applying for bartender position.

2  Q.  Okay.  And --

3  A.  So he said that --

4  Q.  "He" is who?

5  A.  Marino.

6  Q.  Okay.

7  A.  So he said that Natalia, she will give us the training.

8  Q.  Training?

9  A.  Training, yeah.

10  Q.  And what happened?

11  A.  And she told me that-- oh, so Kess went behind the bar.

12  And because it's a small space and that's not enough space for

13  three people, you know, in the same time, so I stayed sitting

14  and I was watching what they were doing.  And then Natalia was,

15  you know, just explaining that I have to fold the silverware

16  and just, you know, just little things.

17  Q.  So she was telling you what you needed to do for the job?

18  A.  Yes.

19  Q.  Okay.  And did you have any further conversation with

20  Mr. Marino?

21  A.  Yes.

22  Q.  What was that conversation?

23  A.  He came to the bar later and he sat next to me.  I just

24  don't remember he talked to Kess first or me first.

25          THE COURT:  Wait a minute.  I don't know what we're

1   going to do, but I don't understand much of what she is

2   saying.

3            Did Mr. Marino come and sit by you, or what are

4   saying?

5            THE WITNESS:  Yes, he came and he sat by me.

6            THE COURT:  Sat by you.  And then what happened?

7            THE WITNESS:  Well, then he asked me some questions

8   about my life and what I'm doing.  And then he asked me to go

9   outside --

10  Q.  Would you stop there and tell us what questions he asked

11  you?

12  A.  He asked where I am from.  I said I'm from Russia.  He ask

13  about my hobbies.

14  Q.  What did you tell him?

15  A.  I said I have no hobbies.  I was just concentrating on the

16  job.

17  Q.  Did he ask you any other questions about your life?

18  A.  He ask what kind of visa.  I said that I'm a permanent

19  resident.

20  Q.  Any other questions about your life?

21  A.  Then he ask me to go outside for a walk.

22  Q.  Okay.  And did you?

23  A.  I did.

24  Q.  And what happened on the walk?

25  A.  I told him that I have to go, by the way.  That's why he

1   said, "Okay, let's go for a walk."  I-- you know.

2   Q.  So he went outside with you so you could go, is that right?

3   A.  Yes.  He wanted to talk to me before I go.

4   Q.  And what did you talk about?

5   A.  So we talk-- when we went outside and he told me about

6   himself, that he's from Italy and he was continuing.  He said

7   that I'm very, very beautiful and he offered me job as a

8   hostess.

9            THE COURT:  He what?

10           THE WITNESS:  He offered me a job as a hostess.

11           THE COURT:  As a hostess?

12           THE WITNESS:  Hostess, yeah.

13  A.  I was surprised that such offer came, you know, because I

14  applied for bartender position.  And I thought that I got the

15  job.  And he said that he's going to pay me $120 in cash.  I

16  don't know why he said he would pay me in cash.  Well --

17  Q.  What did you say to him about the hostess position?

18  A.  I said that I'm not interested because I'm here to be a

19  bartender.

20  Q.  Okay.  And then did he talk about anything else with you in

21  the conversation?

22  A.  Yes.  He offered me to live -- he told me that he has an

23  apartment on Pearl Street and that he has two girls, two

24  waitresses, currently living there.  And he said that he's

25  going to kick them out.  And he said that-- oh, and he said,

E4NBMIRT                        Mironova - direct

1    "It would be great if you work for me and you live there and we

2    can party sometimes."  And I told him --

3              THE COURT:  What did he say about that apartment?

4              THE WITNESS:  He said that it would be great if I

5    would work there and live there and he would party.  Party.

6    Q.  Did he say this on this first occasion?

7    A.  Yes.

8    Q.  The party comment?

9    A.  He repeated that later on in more details.

10   Q.  Did he say he was going to charge you rent?

11             THE COURT:  Did you say something about partying?

12             THE WITNESS:  Yes.  He wanted to party and he meant --

13             THE COURT:  I don't understand what you're saying.

14             MR. KAUPP:  She said that he would like to party

15   there.

16   Q.  What did you --

17   A.  With me.

18   Q.  What did you understand him to mean?

19   A.  I understood that he had some kind of-- he wanted some kind

20   of, I don't know-- well, I took, like, sexual maybe.  I don't

21   know.

22   Q.  Is it uncomfortable for you to --

23   A.  It is uncomfortable --

24   Q.  Stop.  Is it uncomfortable for you to say here?

25   A.  What?

1    Q.  Is it uncomfortable for you to say what he said to you,

2    what you thought he meant, here in front of this Court?

3    A.  Well, the whole thing is uncomfortable.

4    Q.  Okay.  I understand, but I need you to say what happened

5    and what you thought.  I know it's difficult.

6           What did you understand him to mean when he said he

7    wanted to party with you there?

8    A.  Well, I'm sorry, I got frustrated.  Can you repeat the

9    question?

10   Q.  I can.

11          What did you understand Mr. Marino to mean when he

12   said you could live at the apartment and he would want to party

13   there?

14   A.  Well, he-- I understood that he wanted to come in and, I

15   don't know, have a drink.  Just have some-- I don't know, some

16   sexual relationship, I guess.

17   Q.  Did he say he was going to charge you to live in the

18   apartment?

19   A.  No, he said "You will live for free."

20   Q.  Okay.

21   A.  And I told him that I'm married.

22   Q.  And what did he tell you?

23   A.  "I'm also married," he said, "but it doesn't matter."

24   Q.  And how did you feel after he said he was married?

25   A.  Well, I felt a little calm because for me marriage is very

```
 1   serious.  I'm not-- I think that other people take it
 2   seriously, too.  So I took his inappropriate comments as part
 3   of his personality and part of his greeting, so I tried to
 4   ignore that.
 5            THE COURT:  You tried to what?
 6            THE WITNESS:  Ignore.  Ignore that he made such a--
 7   such comments.  And I saw that, you know, he's married.
 8            THE COURT:  Okay.
 9            THE WITNESS:  I don't have to worry about anything.
10   He's married.  That's it.
11   Q.  Okay.  And then did you start --
12            THE COURT:  Let's take a break now.
13            MR. KAUPP:  Okay.
14            THE COURT:  We'll take a break.  We'll take a recess,
15   please, ladies and gentlemen.
16            JURY:  Your Honor, for how long?
17            THE COURT:  As short as possible.  About ten minutes.
18            JURY:  Gotcha.
19            (Jury excused)
20            (Recess)
21            THE COURT:  We're going to try to improve the
22   audibility, clarity, of the testimony for the jury.  My deputy
23   clerk is here, who is going to stick with us.  If there's a
24   problem with the witness sitting too close to the microphone or
25   something like that, we're going to try to work that out,
```

1    because I have had considerable difficulty understanding and

2    maybe I'm not the only one.

3              So we'll try to remedy that.  All right?  Let's go

4    ahead.

5              MR. KAUPP:  Thank you, your Honor.

6    BY MR. KAUPP:

7    Q.  Ms. Mironova, Tatiana, when did you-- you did the training

8    the day of your interview.

9              Did you start to work shortly thereafter?

10   A.  Yes.

11   Q.  Okay.  And do you remember when that was?  Do you remember

12   how many days?

13   A.  No.  We-- we spoke about it when we were outside, on the

14   sidewalk.  He told me when to come in.  I'm pretty sure it was

15   on Wednesday, Thursday, Friday.  Something like that.

16             THE COURT:  And he told you when to come in and what

17   happened?

18             THE WITNESS:  He just told me when to come in next

19   time for-- for work.  And I ask him what to wear, and he said I

20   should wear short dresses.

21   Q.  Okay.  And during that first week of work, did you have an

22   opportunity to observe Mr. Marino?

23   A.  I'm sorry, I didn't hear.

24   Q.  Well, strike that.

25             During your first week of work, did you interact with

```
 1    Mr. Marino?

 2    A.   Yeah, of course.

 3    Q.   Okay.  And did he make any comments to you that you

 4    considered inappropriate?

 5    A.   He did.

 6    Q.   And what sorts of comments were those?

 7    A.   Well, that I'm pretty.  He like my short dress, which

 8    wasn't short; that he likes my legs.  He would bring me-- they

 9    have the --

10         THE COURT:  What about your legs?  Just take it easy

11    and speak clearly.  Did he say something about your legs?

12         THE WITNESS:  Yes.  He said that I have beautiful

13    legs.

14         THE COURT:  All right.

15    A.   And he, what he do, what he did to me --

16    Q.   Well, I asked about comments, so we'll get there.

17    A.   I'm sorry.

18    Q.   It's okay.

19    A.   Sorry.

20    Q.   This is not like an ordinary conversation and I know you're

21    not well-practiced at it.  So just follow my lead, okay?

22         Now, you mentioned inappropriate comments.  Were there

23    any you forgot in that first week?

24         THE COURT:  I didn't understand your question.

25         MR. KAUPP:  I'll withdraw the question.
```

1   Q.  Any other inappropriate conduct that you observed that

2   first week from Mr. Marino?

3   A.  It was so many it's just impossible to remember everything.

4   It was every day.  Every day.  Every day that's happened.  You

5   would come in and he would just make comments about my

6   appearance.

7   Q.  Okay.  And other than comments, anything else?

8   A.  Yes.  For example, I came in to work and he -- when he

9   comes in, he would go, for example, smoke some marijuana or

10  just do other drugs --

11          MR. CESARATTO:  Objection, your Honor.  Objection,

12  your Honor.  There's no foundation for that testimony.

13          THE COURT:  There doesn't have to be a foundation.  If

14  she observed something, she can testify.

15          MR. CESARATTO:  Well, I don't believe she said she

16  observed it.

17          THE WITNESS:  Well, I observed it.

18  Q.  Did you smell marijuana being smoked?

19  A.  I not only smelled it, I walked in in the office.  If I

20  have a question, I walk in, and he's smoking.  And it's nothing

21  that's-- everybody knew it and he didn't hide it.  And he had

22  his little thing, like a jewelry box that women have.  He had

23  it and he had it in his office.  Oh, see, nobody even realize

24  like I have it here.  It was just-- well, when he did-- when he

25  does-- the point is whether he does that --

1          THE COURT:  When he what?

2   A.  The point is when he go and smoke marijuana, he's high.

3   And he comes to me and he ask me, "Oh, I want to talk to you."

4   And he brings me behind the wall and he --

5          THE COURT:  He what?  Behind the wall?

6          THE WITNESS:  Yeah, he ask me to come behind the wall.

7   It's three tables over there.

8          THE DEPUTY CLERK:  Just a little back from the mic.

9   Stay back from the mic.

10  A.  It's three tables over there.  And he ask me to-- well, we

11  sit down, and it's mirrors.  He would sit in front of me and he

12  would touch my knee.  He would tell me his story, mostly about

13  his wife.  That his wife and him arguing all the time and that

14  she, you know, punishing his child or something.  You know, he

15  doesn't like his child to be punished and they were arguing

16  about it.

17         And then he would say that he likes me very much and

18  that's --

19  Q.  Okay.

20  A.  Again, he asked me to live in his apartment on Pearl

21  Street.

22         THE COURT:  He asked you what?

23         THE WITNESS:  He asked me to live in his apartment on

24  Pearl Street.

25         THE COURT:  He asked you to live in his Pearl Street

1    apartment?

2              THE WITNESS:  Yes.

3    Q.  And that was in the first week that you started working, he

4    brought up the Pearl Street apartment again?

5    A.  Yes.

6    Q.  And what did he say?

7    A.  He said that some guy named Carl, that he is renting out

8    the apartment from him and that this is the place where

9    waitresses live.  And he has currently two waitresses living

10   there which is Natalia Odegova.

11             THE COURT:  Who?

12             THE WITNESS:  Which is Natalia Odegova, his lover,

13   and --

14             MR. CESARATTO:  Objection, your Honor.  Again, there's

15   no foundation for that testimony.  The objection is what's the

16   basis?

17             THE COURT:  She is testifying as to what he said to

18   her.  There is a foundation.

19             MR. CESARATTO:  Judge, I don't believe that was the

20   question, respectfully.  She wasn't asked if Mr. Marino said

21   Natalia Odegova was her lover.  She said Ms. Odegova was her --

22             THE COURT:  Please.

23   Q.  Okay.  You mentioned Ms. Odegova.  Did you say there was

24   another woman living there?

25   A.  Yes, it's another waitress.

 1             THE COURT:  Is this something he said to you?

 2             THE WITNESS:  Yes.

 3             THE COURT:  All right.

 4   A.  So --

 5             THE COURT:  And what did he say to you?

 6   A.  He said that they live there, that Odegova and Genny

 7   Wilson, they currently live there.

 8   Q.  Okay.  And you also mentioned a wall at the restaurant.

 9   I'm putting on the screen what's been admitted into evidence as

10   Plaintiff's Exhibit 52C.

11             Now, do you see this line of tables where my pen is?

12   Do you see that, Tatiana?

13   A.  Yes.

14   Q.  Okay.  To the right of the tables is a wall.  Is that the

15   wall you were saying he would take you behind?

16   A.  Yes, it's two entrances behind that wall.

17   Q.  Okay.  Now I'm going to bring my pen up the wall.  Tell me

18   where the entrance to the room with the tables is.

19   A.  Stop.  This is one of the entrances.

20   Q.  Okay.  Behind that wall there were how many tables?

21   A.  Three tables.

22   Q.  And that's where you said you would sit with him.  He would

23   smoke marijuana, he would come and take you behind the wall and

24   sit at a table?

25   A.  Yes, that we could both-- that I could watch the bar if

1   customer would come in.  I could easily come behind the bar and

2   serve the customer.

3   Q.  Okay.

4   A.  But also it's a perfect place, you know, that nobody see us

5   there.

6            THE COURT:  That he what?

7            THE WITNESS:  Nobody could see us there.  Like that's

8   the place to hide.  One of the hiding places.

9   Q.  Okay.  You mentioned there are two openings to that hallway

10  with the three tables, right?

11  A.  Uh-huh.

12  Q.  Okay.

13           MR. KAUPP:  Your Honor, for identification purposes

14  I'm showing counsel what's been marked as Plaintiff's Exhibit

15  52D.

16           May I show this to the witness?

17           THE COURT:  Yes.

18  Q.  Tatiana, do you recognize what this depicts?

19  A.  Yes, this is the first exit.

20  Q.  Into the room with the three tables behind the wall?

21  A.  Yes.  Yes.

22  Q.  Is this a fair and accurate representation of what this

23  shows?

24  A.  Yes, it is.

25           THE COURT:  Drop that formality of "fair and accurate

1    representation."

2              MR. KAUPP:  All right.  I'd like to move this into

3    evidence.

4              THE COURT:  Received.  Received.

5              MR. KAUPP:  Thank you.

6              (Plaintiff's Exhibit 52D received)

7              THE WITNESS:  The chair wasn't there, by the way.

8    Q.  Okay.  This photo-- well, where is this photo taken?  Do

9    you know?  From what vantage point?

10   A.  Behind the bar.

11             THE COURT:  The what?

12             THE WITNESS:  Behind the bar.

13   Q.  Okay.  And this is one of the entryways to the area with

14   the three tables?

15   A.  Yes.

16   Q.  Where you said it was hard to see.

17   A.  Yes.

18   Q.  Okay.  And that's where he would touch your leg.  Is that

19   what you said before?

20   A.  Yes, behind that wall.

21   Q.  Thank you.

22   A.  Well, he would touch me in other places, not only there.

23   But in the beginning, when he was telling me the stories, he

24   would bring me there.

25   Q.  Thank you.

```
 1          In this first week, was there any point where he began
 2   to whisper in your ear?
 3   A.  Yes.  I don't remember if the first day.  Almost right
 4   away.
 5   Q.  How would he do this?
 6   A.  Well, for example, I would walk to the kitchen and he would
 7   stop me and he's, like, "Tatiana, I want to tell you
 8   something."  And he would grab my neck, he would --
 9          THE COURT:  He would what?
10   Q.  Slow down.  Tell the judge.
11   A.  Because I'm taller than him, he would grab my neck and he
12   would whisper in my ear and his lips touching my ear.
13          THE COURT:  He would-- grab?
14          THE WITNESS:  He grabbed my neck.
15          THE COURT:  Grabbed your neck?  I didn't hear that.
16          THE WITNESS:  Yes, he grabbed my neck and he
17   whispering in my ear, his lips touching my ear.  And he
18   saying, "I want you."  That's one of the things he told me.
19   That was very-- I don't know.  I don't really know how to
20   describe that.
21   Q.  What other things-- so when he whispered in your ear,
22   you're saying he would grab your neck.  Would he pull your neck
23   towards or your head towards his ear?
24   A.  Well, when he grabbed my neck, I automatically, you know,
25   probably lean and he, you know, whisper in my ear.
```

E4NBMIRT                          Mironova - direct

1   Q.  And you mentioned he wants you?

2   A.  Yeah, he wants me or "You're so hot" or later on he's like

3   "Let's go to Miami."

4   Q.  Hold on.  We're just sticking with the first week or so of

5   your work there.  Okay?

6   A.  At first he was saying that "You're pretty."  He did not

7   say "I want you."  Later on he was saying "I want you."

8   Q.  After what period of time did the whispering change to "I

9   want you"?

10  A.  Approximately like in a month and a half, right before

11  Yuliya Synyuk came in.

12  Q.  Now, in your first three weeks of working at DaMarino's

13  Restaurant, did you also observe Mr. Marino with other female

14  employees?

15  A.  He did the same thing to everybody.  It doesn't matter

16  bartender or waitress.  He would take us one by one.  He would

17  say "I want to talk to you."  What are you going to say?  No?

18  Girls would go behind the wall and I would see them in the

19  reflection of the mirror, because you can see --

20          THE COURT:  You can see-- now I'm not understanding

21  you now.  Take it easy.

22          THE WITNESS:  Okay.  This is --

23  Q.  Stop.  I'll pick it up.

24          You mentioned being able to see Mr. Marino with other

25  women in the reflection of the mirror, right?

1   A.  Yes.

2   Q.  I'm showing you what's been admitted into evidence as

3   Plaintiff's 52D.

4           Is this the mirror you were saying you would see

5   Mr. Marino with other women?

6   A.  Yeah.

7   Q.  What other women worked at DaMarino's at this period of

8   time?

9   A.  It was a lot of-- a lot of girls.  And most of them, they

10  were immigrants, didn't have papers.  So they would --

11          THE COURT:  They were what?

12          THE WITNESS:  They were immigrants.

13  Q.  Tatiana, who?  What are their names?

14  A.  Okay.  At the beginning or just the --

15  Q.  The first few weeks that you were observing Mr. Marino with

16  other female employees, what were the names of these employees?

17  A.  I have to, I guess, look at the schedule or something.

18  Q.  Okay.

19          MR. KAUPP:  Your Honor, may I refer the witness to

20  refresh her recollection to Plaintiff's Trial Exhibit 49?

21  Q.  To refresh your recollection, please look in the white

22  binder, Tatiana, to Exhibit 49.  Please look at Plaintiff's

23  Trial Exhibit 49.

24  A.  Well, if you can see, it's --

25  Q.  I'm asking you to look at this document to refresh your

1   recollection of who worked there, that you observed working

2   there the first few weeks when you started.

3   A.  Well, on page 92 Natasha.

4   Q.  Who is Natasha?

5   A.  Just a Russian girl.  And on 93 you see Olga.

6   Q.  Do you know Natasha's last name?

7   A.  No.

8   Q.  Next is Olga?

9   A.  Olga.

10  Q.  Do you know where Olga was from?

11  A.  Russia, obviously.

12  Q.  Why do you say "obviously"?

13  A.  It's a very common Russian name.  Besides that, we spoke

14  Russian and, you know...

15  Q.  Who else worked at DaMarino's Restaurant?

16  A.  A lot of girls that would come in, they had no papers and

17  he offered them hostess job or coat check job.  And obviously

18  they're not on schedule.  He would just tell them come in on

19  that days, so there is no record for that.  However, you know,

20  after I can point out a few names that were not-- they were

21  working for cash as a coat check, you know.

22  Q.  At this point I'm just asking you the names of the other

23  women that you worked with the first few weeks while you were

24  employed.

25  A.  Okay.  It was -- like I said, during the beginning it was a

E4NBMIRT                         Mironova - direct

```
 1    lot of girls.  There were-- they had a training --

 2    Q.  Just the names, Tatiana, of other women that worked there

 3    these first few weeks.

 4    A.  Well, I don't remember more--

 5    Q.  Would you please look at Plaintiff's Exhibit 49 to see if

 6    you can refresh your recollection.

 7    A.  They are not on the-- the names were on the schedule I

 8    said.

 9    Q.  Okay.

10    A.  Most of them were not on the schedule and they had only

11    two--

12    Q.  During your interview you mentioned a woman named Kess.

13    A.  Yes.

14    Q.  Did you see Kess at the restaurant the first few weeks you

15    were employed there?

16    A.  We had different-- I saw her when she had the server

17    shifts.

18    Q.  Okay.  And was Kess Eastern European?

19    A.  No, she was African-American.

20    Q.  Okay.  And did you observe Mr. Marino with Kess?

21    A.  Well, he was always around her because --

22             THE COURT:  He was what?

23             THE WITNESS:  He was always around her because her

24    unusual look, as he refers it to.

25    Q.  What was her unusual look?
```

E4NBMIRT                        Mironova - direct

1   A.  Well, it was very, very, very pretty girl.  She has-- she

2   had very big breasts.  And he was-- and she was very skinny and

3   he really liked her very much.  He always would bring his

4   friends or the customers to show her to them.  He would say,

5   "Oh, look at my black diamond" or look at my-- "Look at my

6   girl."  And they look at her breasts and he would, you know--

7   like, for me, if he would show like-- if he would refer to

8   me --

9   Q.  Did you consider that to be offensive?

10  A.  Very offensive.

11  Q.  Did you hear him make other comments about Kess's breasts?

12  A.  Yeah, he was always joking about that.

13  Q.  What else did he say?

14  A.  Well, what I said, that's what I remember right now, what

15  really disturbed me the most.  But he just-- it's a long time

16  ago.

17  Q.  Okay.  Did you observe him whispering into any other

18  servers' ears?

19  A.  Everybody.

20  Q.  Okay.  In your first few weeks of working there, did you

21  ever observe him with an employee or woman named Elena?

22  A.  Yes.

23  Q.  Can you please tell us about that?

24  A.  Well, this girl, she was from Ukraine, I think, or somebody

25  like Eastern European.  And I saw, like, she had-- she was

1    there for, like, one day or two days.  I don't remember.

2              THE COURT:  She was what?  I'm not hearing you.

3              THE WITNESS:  She was working there -- she was on

4    training for server position for one day or two days.  And I

5    saw them having sex in office.

6    Q.  And please describe what you saw.

7    A.  Okay.  I was working in the bar.  At that time we didn't

8    have runners, so I would come in to pick up the food in the

9    kitchen.  Because, as you saw in the restaurant, I was working

10   right by the door and I was very-- I was wearing a dress, as

11   you saw in the video, and it was very cold.  So I would go and

12   I would warm up next to the oven.  And when you come to the

13   oven, when I was going to oven to warm up, I heard noises.  And

14   I automatically turn my head and I saw in the crack of the door

15   that-- I saw Marino standing and his pants down to his knees

16   and I saw --

17             THE COURT:  You saw what?

18             THE WITNESS:  I saw Marino standing and I saw his--

19   you know, he was very-- his, like, T-shirt, short, and his

20   pants were down to under his knees.  Basically his pants were

21   on the floor.  And I saw that the girl was leaning in her

22   chair.  I did not see her full body.  I only saw her-- I only

23   saw her-- I'm sorry.

24   Q.  Could you stand up?  Because you're indicating to a point

25   on your body we can't see.  Would you please stand up and show

1   the jury what part of Elena's body you saw.

2   A.   Okay.  So he was standing like this.  I saw his, you know,

3   this.

4   Q.   The side of his body you're indicating from --

5   A.   Yeah.

6   Q.   -- the top of his torso down to where?

7   A.   The whole thing.

8   Q.   His legs included?  Okay.  The whole side of his body.

9   A.   The side.  And then she was leaning-- she was leaning on a

10  chair.

11  Q.   Okay.

12  A.   Because there's two chairs over there in the office.  And I

13  did not see her-- I did not see her-- I did not see her head or

14  that part of her body, but I saw her -- this part.

15  Q.   And what --

16  A.   And she was in kind of that position.

17  Q.   Okay.  And you're leaning forward.

18       Did she-- was the part of her body that you saw, was

19  it bare or was there clothing on it?

20  A.   No, it was naked.

21  Q.   What was she wearing?

22  A.   She was wearing a dress.

23  Q.   But that part of her body was naked?

24  A.   Yes.

25  Q.   And what did you observe them doing?

E4NBMIRT                    Mironova - direct

```
 1   A.  Well, when I heard-- when I saw the noises, I look like
 2   this.  I saw and I was-- you know, I turned back and I didn't
 3   want to, like, even, you know, continue looking at them.  I
 4   was -- it's not my business, you know.  I just left.
 5   Q.  Okay.
 6   A.  Did not tell anybody.  Just left.
 7   Q.  And how did you know who was in the office with him if you
 8   didn't see the top half of her body?
 9   A.  Well, after that I obviously was curious and I saw who's
10   leaving from the kitchen, from that, you know.
11   Q.  Who did you see leave?
12   A.  Elena.
13   Q.  Elena?
14   A.  After that I never saw her again.
15   Q.  Okay.
16          MR. KAUPP:  Your Honor, I'm going to show the witness
17   two more exhibits that I'd like to put into evidence.  One has
18   been marked 52E.
19   Q.  Is this --
20   A.  Yes.
21   Q.  And this shows the restaurant?
22   A.  That shows the kitchen.
23   Q.  Okay.  And is that how you remember it?
24   A.  I think so, yeah.
25          MR. KAUPP:  Your Honor, I'd like to move 52E into
```

1    evidence.

2            THE COURT:  Received.

3            (Plaintiff's Exhibit 52E received)

4    Q.  52F, what does that show?

5    A.  This is the way to the office.

6    Q.  And is that an accurate picture?

7    A.  I think they were last on the right because it's kind of

8    closing the view and it was less out there.

9    Q.  Other than having less stuff on the right, does the layout

10   look like --

11   A.  Yes.  And the door was different.

12   Q.  Okay.

13           MR. KAUPP:  Your Honor, I'd like to move 52F into

14   evidence.

15           THE COURT:  Received.

16           (Plaintiff's Exhibit 52F received)

17   Q.  Now, Tatiana, you mentioned from your vantage point in the

18   kitchen, you were-- you went back because you sometimes either

19   picked up food or you warmed yourself by the oven, is that

20   right?

21   A.  Yes.

22   Q.  This picture shows us the floor of the dining room with

23   some tables, right?

24   A.  Yes.

25   Q.  And then it goes back into the kitchen?

1    A.  Yes.

2    Q.  And now over here, on the right, what is this area?

3    A.  This is the way to go to the office.

4    Q.  Okay.  That's where the hallway to the office is?

5    A.  Yes.

6    Q.  And where were you standing when you turned and saw Elena?

7    Was it close to where my pen is?

8    A.  Yes.  I came to check the food.  I see no food.  So I would

9    go to the oven and I would just, like, warm up my hands.

10            MR. KAUPP:  And for the record we're referring to

11   Plaintiff's Exhibit 52E.

12   Q.  Now I'm going to show you Plaintiff's Exhibit 52F.  Is this

13   the hallway to the office?

14   A.  Yes, it is.

15   Q.  Okay.  And is this the office door?

16   A.  Yes, it is.

17   Q.  Now, you told us that this picture shows more things in the

18   hallway than were there before?

19   A.  Yes.

20   Q.  Okay.  So you had a better view at the time?

21   A.  Well, yeah, of course.  And he was sitting sometimes and he

22   was watching what's going on in the kitchen.  Like, it's

23   clearly-- right now you can't see anything, but hundred percent

24   you could see from there.  You could see what's going on in the

25   office.

1    Q.  You could see the door there?

2    A.  Yeah.

3    Q.  Was the door open?

4    A.  Yeah.  It's kind of open right now, too.

5    Q.  No, that day that you saw Mr. Marino with Elena.

6    A.  Of course, yeah.

7    Q.  Can you tell us, about how many different servers were

8    working at the restaurant in the first few weeks when you

9    worked there?

10   A.  Well, we can take a look at the schedule.

11   Q.  Well, just an idea.  About how many female servers were

12   working at the restaurant?

13   A.  Usually one captain or two and then three -- depends on

14   the-- depends on the day.  If it's Monday, Tuesday, Wednesday,

15   it's very slow.  Then it's less people.  If it's Friday,

16   Saturday, Sunday-- Thursday, Friday, Saturday, it's more

17   people.

18   Q.  Okay.  Take a look at the schedule, if you will, to refresh

19   your recollection.

20          About how many different female servers were working

21   at DaMarino's the first few weeks you were employed there?

22   A.  I'm sorry?

23   Q.  Plaintiff's Exhibit 49.

24   A.  Yes.

25   Q.  Take a look at the employees' schedule to refresh your

1  recollection as to how many different female employees were

2  working at DaMarino's.

3  A.  Like, nine.

4  Q.  Okay.  And how many of them were from --

5  A.  That's on the schedule.  A lot more without the schedule.

6  Q.  Okay.  There are more that aren't represented on there?

7  A.  There are a lot more that were just working for cash.

8  Q.  Okay.  And how many of the female employees were of Eastern

9  European descent, if you know?

10 A.  Majority.

11 Q.  How do you know where they were from?

12 A.  Well, they come for-- well, because I had to do the

13 service.  When they come, we speak Russian or, you know-- we

14 speak Russian.  They would tell me.

15 Q.  Okay.  And then after your first few weeks of working

16 there, did anything occur at the restaurant that caught your

17 attention?

18 A.  After few weeks?  I mean, the whole behavior was-- I was

19 trying to stay away.

20 Q.  Okay.  Did there come a time when Mr. Marino fired some

21 servers after your first few weeks?

22 A.  He did.

23 Q.  Can you tell us about that?

24 A.  Well, he would fire people, like a lot of people at same

25 time.  And he has a strategy.  What he does is he hires --

E4NBMIRT                        Mironova - direct

1          THE COURT:  I'm not understanding you.  He had what?

2          THE WITNESS:  He has a strategy.  He has a strategy

3    for his harassment.  What he does --

4          THE COURT:  For his what?

5          THE WITNESS:  For his harassment to girls.  What he

6    does, he hires immigrants --

7          THE COURT:  He what?

8          THE WITNESS:  He hire immigrants, like Eastern

9    European who doesn't have documents, for example.  Like, we

10   don't know that we have rights or something, so he will hire

11   them.  He will approach them.  He will try to touch them,

12   whisper in their ear, you know.  And then if they deny him,

13   they don't have sex with him, then he'll fire them.  He will

14   create -- he will try to pressure them, he will come--

15         THE COURT:  He will what?

16         THE WITNESS:  Pressure, like mental pressure.  He will

17   come to-- for example, the girls are trying to do a good job

18   and he will come and say, Oh, this glass standing is not there.

19   Even he never told where the glass should stand, or they're not

20   responsible even for them.  He would create issues that were

21   just absurd that they would get upset and they would be more--

22   they would be nicer to him and maybe they would let him touch--

23   they would let him touch them.  And if they say, no, I don't

24   want to have sex with you, he would just fire them.

25   BY MR. KAUPP:

1   Q.  Let's back up because --

2              THE COURT:  I'm not really understanding.

3              MR. KAUPP:  I'm going to break it up, your Honor.

4              THE COURT:  Jon, we've got to get this cleaner.

5              MR. KAUPP:  I'll break it up.

6   Q.  And I want shorter answers, Tatiana.  Okay?

7   A.  Okay.

8   Q.  You said you observed Mr. Marino with girls behind the

9   wall.  Do you recall that?

10  A.  Yes.

11  Q.  Did you ever observe what these female employees-- what

12  their reaction was to Mr. Marino?

13  A.  Well, they were-- some of them would, you know, accept his

14  comments and they would just, I guess, play along with him.

15             THE COURT:  Some of them would what?  I'm not

16  understanding.

17  Q.  Speak into the microphone, please.

18  A.  Some of them just they will accept his attention.

19  Q.  Okay.  And what about others?

20  A.  Well, others would back up and say "I don't like it."

21  Q.  You would see them back up?

22  A.  Well, it's a normal reaction for a girl who doesn't like --

23  Q.  Did you observe some of the women he approached back away

24  from him?

25  A.  Yes.  Like, for example, when he was talking with them

E4NBMIRT                         Mironova - direct

1   behind the wall and he would touch their knee, as he did to me,

2   they would back up.

3   Q.  And after that would happen, would you observe Mr. Marino's

4   reaction?

5   A.  Well, the reaction is, okay, this deny.  I'm going to go

6   harass next one.

7   Q.  Okay.  Did you ever see --

8           THE COURT:  I didn't understand that.

9           THE WITNESS:  He said-- I said if one girl say I don't

10  like you, you know, harassing me or-- I'm sorry, I have to

11  concentrate because it's...

12          For example, the girl says "I don't like it," he would

13  go and touch some other girl.

14          THE COURT:  If a girl objected, what would he do?

15          THE WITNESS:  I'm sorry?

16  Q.  If a girl objected, what would he do?

17  A.  What is "objected"?

18  Q.  If a girl turned him away or pushed him away or moved away

19  from him, what would he do?

20  A.  So he would go to another girl.

21  Q.  Okay.

22          THE COURT:  He would what?

23          THE WITNESS:  He would go to another waitress.

24          THE COURT:  Oh.

25  Q.  Okay.  And then did you observe him interact with a woman

E4NBMIRT                          Mironova - direct

1    that rejected him later?

2    A.  Well, they would eventually get fired.

3    Q.  Okay.  You had mentioned earlier some comments that he

4    would make to them.  Could you tell us what those comments were

5    after this?

6    A.  Well, I did not hear what he told them because he was

7    whispering in the ear and he tried to make it very-- well, he

8    would try to hide with everyone, like, to be alone.  Like, to

9    be one on one.  But when the girls-- like, when time pass and

10   we become the friends with girls, they would share with me what

11   he is, like, talking.

12           For example, he approach the girl, he would whisper in

13   the ear --

14           MR. CESARATTO:  Objection, your Honor.  Hearsay.

15   A.  He would approach the girl, he would whisper in the ear.

16   And she would come to me and she would say what he told her.

17   And usually is the same thing that he told me.

18   Q.  Okay.  Now, you mentioned in your answer before glasses

19   being out of place.

20           Do you recall that testimony?

21   A.  Yes.

22   Q.  I'm asking you to describe what was happening when he was

23   having those conversations.

24   A.  Well, for example, we working and then I hear screaming.

25           THE COURT:  You heard what?

1          THE WITNESS:  We working, you know.  Nothing going on.

2     I'm talking to go my customer and I hear Marino screaming.

3          THE COURT:  Are you saying you heard screaming?

4          THE WITNESS:  Marino yelling at one of the waitresses.

5          THE COURT:  Oh.

6          THE WITNESS:  And then I would ask "What's happen?"

7     And they would tell me, Oh, they were upset or tell me, "Oh, he

8     yelled at me because the glass wasn't there."  And we would be

9     you know why he's doing it.

10          THE COURT:  I don't understand this testimony.  Now,

11     look, we've got --

12          MR. KAUPP:  We'll move on, your Honor.  We'll move on.

13     Q.  At some point in time, after he fired a few people, did he

14     hold a meeting at the restaurant?

15     A.  What do you mean?

16     Q.  You mentioned he would fire a lot of people from time to

17     time.

18     A.  Yes, he did.

19     Q.  Was there a time when he held a meeting after he fired some

20     people?

21     A.  Oh, okay.  We had a meeting.  It was almost at the

22     beginning of my employment.  He closed the restaurant for lunch

23     and he told us to come in at one o'clock.  I was already

24     friendly with Genny Wilson and Natalia Odegova, and we decided

25     to come at the same time.

 1          THE COURT:  You decided to what?

 2          THE WITNESS:  We decided to meet and come together at

 3   the restaurant.

 4   Q.  For the meeting at one o'clock?

 5   A.  Yes, for the meeting at one o'clock.  They were late and I

 6   decided to go myself.  And I was, like, one o'clock.  I was one

 7   minute late and Marino was already very pissed off.  He was...

 8   Q.  Angry?

 9   A.  He was angry, but he let me-- it was me and Renata.  She's

10   another waitress.  Because I was new, I think that he just took

11   it easy on me.  But then when we went down, me, Marino and

12   Renata, we went down --

13   Q.  Down where?

14   A.  Down into the restaurant.

15   Q.  Okay.  There's some steps that go down into the restaurant?

16   A.  Yeah, yeah.

17   Q.  Okay.

18   A.  And then Genny Wilson and Natalia Odegova are coming down.

19   And when he saw-- when he saw them, he start -- can I?

20   Q.  You can say what he said, yes.

21   A.  He said, "Oh, you fucking bitches, get out from the

22   restaurant."  And he pushed them.  Like, he pushed them out

23   from the restaurant.  I was -- I was very-- I was very shocked

24   that, you know, for somebody being late ten minutes, he would

25   curse and yell like that.

1   Q.  Did he say anything else to them?

2   A.  No, he just pushed them away and they left.  And then I

3   texted them after the meeting --

4   Q.  You what?

5   A.  I met them after the meeting because they didn't go far.

6   Q.  Okay.

7   A.  And they were the ones living in the apartment.

8   Q.  These were the two waitresses living in the apartment?

9   A.  Yes.  So I guess-- it doesn't matter what I think.

10          Anyway, we met them on 48th and something, in a store,

11  because it was still time before my shift.  Our shift.  They

12  were working that night, too.  And he called them and he said

13  "Come to dinner shift."  But that --

14  Q.  He said what?

15  A.  He said "Come for the dinner shift."

16  Q.  Okay.

17  A.  Come to work, basically.  And for me it was --

18  Q.  And did that experience have an impact on you?

19  A.  Well, at that time I thought I better not do something

20  wrong to-- that he would yell at me like that.

21  Q.  After you had been working at the restaurant for about one

22  and a half months, did he fire more people?

23  A.  He did.

24  Q.  About how many people did he fire at that time?

25  A.  The ones who were just working on cash, constantly.  It

1   could be every week.  And then another one.  And he would put

2   an ad on Craigslist again and another people would come in and

3   another people would come in.

4   Q.  Okay.  And then at some point did he tell you that he was

5   looking to hire servers about a month and a half after you had

6   been working there?

7   A.  Yes.

8   Q.  Okay.  And did you talk to anybody about the fact that

9   DaMarino's Restaurant was hiring?

10  A.  Yes.  At Avion, where I used to work, there was a guy

11  working there named Sergé.  He told me that his girlfriend was

12  looking for a job.  And her name was Yuliya Synyuk.

13  Q.  And what did you tell Sergé?  Is this Sergé Vishnev?

14  A.  Sergé Vishnev.

15  Q.  What did you tell Sergé Vishnev?

16  A.  I told him that DaMarino, we have opening position for a

17  server.

18  Q.  Okay.  And did you tell Mr. Marino that Yuliya Synyuk might

19  be interested in the position?

20  A.  Yes, I did.  And he ask me if she's pretty.  I said yes.

21  And he asked me, "Oh, when she can come in?"

22  Q.  Okay.  And did you observe Yuliya Synyuk come for an

23  interview?

24  A.  Yes.

25  Q.  And can you describe what you observed?

 1   A.  Well, I wasn't present for conversation.  They were sitting

 2   at the round table, but I see her when she walk in.  She said

 3   hello.  And I was not friendly with her.  I wasn't a friend of

 4   her.  I just knew her boyfriend and --

 5   Q.  Let me stop you there.  Had you ever seen her before?

 6   A.  Yes.

 7   Q.  How had you come to see her before the day of her

 8   interview?

 9   A.  She came to work where me and Sergé were working

10   together.

11   Q.  She went to the Avion where you worked with Sergé?

12   A.  Yeah.

13   Q.  About how many occasions did you see her?

14   A.  Well, I did not work there much, but almost every time I

15   worked, she was there.

16   Q.  Okay.  Had you met her?

17   A.  Yes.

18   Q.  On a few occasions?

19   A.  My husband was there, too.  It was nightclub.

20   Q.  I understand.  I'm just trying to give the background of

21   how well you knew Ms. Synyuk.

22   A.  Okay.  We did not talk.

23   Q.  Thank you.

24           So you couldn't hear her interview, but what did you

25   see?

E4NBMIRT                        Mironova - direct

1   A.  I saw that when she came in, he met her as member of a

2   family.  He gave her a hug.  He said, "Come sit with me at the

3   round table."  And he-- eventually I saw he asked her to open a

4   bottle of wine.  He poured the wine for her.  And then they

5   were talking about something and then she said that she got a

6   job.

7   Q.  Okay.  And did you observe her start to work at DaMarino's

8   Restaurant?

9   A.  Yeah.  She started training, I guess, at the beginning for

10  the server, as a server, and then he put her as a barback with

11  me.

12  Q.  So at first she was a server?

13  A.  Yes.

14  Q.  About how long was she serving before she became a barback?

15  A.  I can't say--

16  Q.  And a server is a waiter or waitress?

17  A.  I can't say that.  One, two weeks --

18  Q.  Is a server a waiter or a waitress?

19  A.  Waitress.

20  Q.  And then she became a barback?

21  A.  Yes, she became a barback even when I don't need the

22  barback.  There's nothing to do there.

23  Q.  Why didn't you need a barback?

24  A.  Well, all the barback do is folding this-- folding the

25  silverware and taking the glasses, which busboy can do and he

1   done that.  It was just-- I don't know.

2   Q.  At some point did you observe her do more than just be a

3   server or barback at DaMarino's?

4   A.  What do you mean?

5   Q.  Did she become a bartender?

6   A.  Oh, yes.

7   Q.  And when was that?

8   A.  Like -- I don't know.  Two, three weeks.

9   Q.  In the first two, three weeks that Yuliya Synyuk worked

10  there, did you observe Mr. Marino with Ms. Synyuk?

11  A.  We can look at the schedule actually.

12  Q.  Did you understand my question?

13  A.  No.

14  Q.  Do you want me to --

15  A.  Repeat, please.

16  Q.  The first two to three weeks that Ms. Synuk worked at

17  DaMarino's Restaurant, did you observe Mr. Marino with

18  Ms. Synyuk?

19  A.  Well, he approached her as he approached other waitresses.

20  You know, he come to her, you know, try whisper.  He was --

21  Q.  Would he do the whispering to Ms. Synyuk the way you

22  described he did it to you?

23  A.  Yes.

24  Q.  With the grabbing of the neck?

25  A.  He would pull her, also, for the stories and-- the same

1    thing.

2    Q.  Okay.  What happened to your shifts when Yuliya Synyuk

3    started tending bar?

4    A.  My shift got cut.  I got --

5    Q.  Let's stop.  Before Ms. Synyuk was tending bar, what were

6    your shifts?

7    A.  It was either Thursday, Friday, Saturday or Wednesday,

8    Thursday, Friday or -- you know, we can look again at the

9    schedule.  You can see that I was working the best shifts.

10   Q.  So Thursday, Friday, Saturday, are those the best shifts?

11   A.  Yes.

12   Q.  After Ms. Synyuk started tending the bar, what happened to

13   your shifts?

14   A.  He put me on Monday and Tuesday.

15   Q.  Okay.  And how did you find out that you were put on Monday

16   and Tuesday shifts?

17   A.  I think I working Saturday and she worked on Sunday.  And

18   on Sunday I'm getting a call from Simoné, and Simoné is saying

19   now I'm working on Monday/Tuesday.

20   Q.  And who's Simoné?

21   A.  Simoné is a captain.

22   Q.  So he told you you were working Monday/Tuesday.  Did you

23   say anything to Simoné?

24   A.  At that time I said "Why?"  He said "I don't know.  Talk to

25   Pasquale."

1    Q.  Okay.  Did you talk to Pasquale?

2    A.  Yes, I did.

3    Q.  When?

4    A.  When I came on Monday, I approached Simoné one more time.

5    I said, "Simoné, what's happened?"  He said, "You know, that's

6    not me.  Talk to Pasquale."

7    Q.  Okay.  That's what Simoné said when you showed up for your

8    shift on Monday?

9    A.  Yes.

10   Q.  Okay.  Then did you talk to Pasquale?

11   A.  Yes, I did.

12   Q.  And what happened in that conversation?

13   A.  I said, "Why did you cut my shift?"

14   Q.  And what did he say?

15   A.  He said, "Oh, because Yuliya, she kissed me and you did

16   not."  And because --

17              THE COURT:  What did he say?

18              THE WITNESS:  He said that Yuliya, she kissed him and

19   I don't kiss him.

20              THE COURT:  Who is speaking?

21              MR. KAUPP:  Mr. Marino, the defendant, your Honor, is

22   speaking to the plaintiff.

23              THE COURT:  Okay.  I didn't get that.

24              THE WITNESS:  Yeah.  I'm talking to Marino --

25              THE COURT:  Oh, you're talking to Marino.

1            MR. KAUPP:  About why her shifts were cut and this is

2    his response.

3    Q.  Would you tell the judge the response?

4    A.  Yes.  He said that Yuliya kissed him and I don't-- and I

5    don't kiss him.  That's why my shifts cut.

6            THE COURT:  All right.

7    A.  And he also said that she's wearing short dresses and I

8    don't wear short dresses.  That was his response.

9    Q.  Okay.  And after that conversation, did you contact Sergé

10   Vishnev, who you said was Ms. Synuk's boyfriend?

11   A.  Yes, I did.

12           MR. KAUPP:  Counsel, please look at Plaintiff's Trial

13   Exhibit 37.

14   Q.  And, Tatiana, would you please look at-- hold on.  These

15   are --

16           MR. CESARATTO:  It's not 37.

17           MR. KAUPP:  No, not 37.

18           Your Honor, I'm going to show the witness --

19   Q.  Tatiana, do you see anything on the screen in front of you?

20   A.  Yes.

21   Q.  You do?

22   A.  I can see, by the way, that's one page-- page 142 is

23   translated version and 143 is original.

24   Q.  Can I see your binder?  I apologize for the...

25           Okay.  Plaintiff's Trial Exhibit 45.

E4NBMIRT                         Mironova – direct

1          MR. CESARATTO:  Thank you, Counsel.

2          MR. KAUPP:  Any objection?

3          MR. CESARATTO:  To what?

4          MR. KAUPP:  Plaintiff's Trial Exhibit 45.

5          MR. CESARATTO:  Are you moving it in?

6          MR. KAUPP:  No, not yet.

7          MR. CESARATTO:  Then no objection to you showing it to

8     her.

9          MR. KAUPP:  Okay.

10    Q.  And, Tatiana, what is Plaintiff's Trial Exhibit 45 marked

11    PLF 142 and 143?

12    A.  This is my conversation between me and Yuliya's boyfriend.

13    Q.  Okay.  143.  Through what format?  Through what manner?

14    A.  In Russia we have this-- kind of like Facebook, but for

15    Russians.

16    Q.  What's it called?

17    A.  It's called Odnoklassniki.

18    Q.  Spell that.

19    A.  I have to write it down.

20    Q.  Okay.  It's a Russian Facebook in a sense?

21    A.  Yes.

22    Q.  Okay.  And 143, does that look-- does that appear to be the

23    message you sent to Sergé Vishnev?

24    A.  It is.

25    Q.  Okay.  And I see dates on there:  October 27, 2009, and

E4NBMIRT                          Mironova - direct

 1   then November 22nd, 2009.

 2              Do you see those dates?

 3   A.  Yes.

 4   Q.  And this is the message that you sent to him?

 5   A.  I did.

 6   Q.  Okay.

 7              MR. KAUPP:  Your Honor, I'd like to move Plaintiff's

 8   45 into evidence.

 9              THE COURT:  Received.

10              MR. CESARATTO:  Your Honor, I just have an objection

11   to that.  It's plaintiff's own statement coming in for the

12   truth.  It's hearsay.

13              THE COURT:  Can I see it?

14              MR. KAUPP:  Yes.

15              THE COURT:  Is it in the binder?

16              MR. KAUPP:  It is, your Honor.

17              THE COURT:  Well, I didn't follow this very well.

18   What is this?

19              MR. KAUPP:  This is a message she sent to Sergé

20   Vishnev soon after her shifts were cut by Mr. Marino and given

21   to Yuliya Synyuk.  And this is the message she sent to Yuliya

22   Synyuk's boyfriend.

23              THE COURT:  This is a message she sent to whom?

24              MR. KAUPP:  To Sergé Vishnev.

25              THE COURT:  Who is Sergé Vishnev?

 1              MR. KAUPP:  Yuliya Synyuk's boyfriend.

 2              THE COURT:  Who is Yuliya Synyuk?

 3              MR. KAUPP:  Yuliya Synyuk is the waitress that became

 4     a bartender.  Mr. Marino gave Yuliya Synyuk Ms. Mironova's

 5     bartender shifts.

 6              THE COURT:  I think I'll sustain the objection.  I

 7     think this is hearsay.  Objection is sustained to 45.

 8              MR. KAUPP:  Okay.

 9     Q.  Do you recall what you told Mr. Vishnev?

10     A.  I do.

11     Q.  What did you tell Mr. Vishnev?

12              MR. CESARATTO:  Objection, your Honor.  Same

13     objection.

14              MR. KAUPP:  Your Honor, I want her to testify from her

15     memory what she told Mr. Vishnev.

16              MR. CESARATTO:  Your Honor, if --

17              MR. KAUPP:  This goes to her state of mind.

18              THE COURT:  Sustained.

19              MR. KAUPP:  This is for her state of mind, your Honor,

20     that she was upset at her shifts being cut.

21              THE COURT:  Objection is sustained.

22     Q.  At that time were you upset that your shifts were cut?

23     A.  Well, I was very upset.  I was pissed off because I had-- I

24     had the plan how to avoid Marino.  So when he approached me, I

25     would-- I would just joke about it.  I was like, Ha-ha, and I

E4NBMIRT                          Mironova - direct

1   go back to the bar as quickly as I pass.  Or as soon as I seen

2   him, I just try to avoid him.

3          And when everything was okay and I was doing my best

4   to avoid him, you know, and I thought if she would come in and

5   new people come in, he would harass them, not me.  So when--

6   and I was --

7          THE COURT:  No, I don't understand this testimony.

8   Now, what is it?

9          MR. KAUPP:  Your Honor, I'll back up.

10          THE COURT:  Back up.  Back up.

11          MR. KAUPP:  Okay.

12   Q.  Well, Tatiana --

13   A.  So --

14   Q.  Let me stop you.  Answer the questions with short answers,

15   please.

16   A.  I was very upset.

17   Q.  And you let Mr. Vishnev know you were upset?

18   A.  Yes.  And I let her boyfriend to know what Mr. Marino does

19   at his restaurant.

20   Q.  Okay.

21   A.  And how he treats waitresses and the staff and me

22   specifically.

23          THE COURT:  Look, just ask her questions.

24          MR. KAUPP:  I'm trying to get her to answer short --

25          THE COURT:  All right.

1   Q.  Make short answers, please, Tatiana.

2           Did you also let Yuliya Synyuk know at the same time

3   you were upset?

4   A.  Yes, I did.

5   Q.  And what happened to your relationship with Ms. Synyuk when

6   she received your bartender shifts?

7   A.  Well, I was upset at her.  I didn't want to talk to her

8   anymore.

9   Q.  Okay.

10  A.  And I sent her, also, a message on the Facebook.  I

11  expressed my feelings to her that, you know --

12          THE COURT:  All right.  Please.

13  Q.  Just the time period.  Tatiana, when did you send her the

14  message that you were upset?

15  A.  We can take a look.

16  Q.  Do you need to refresh your recollection?

17  A.  Oh, probably the same day or the next day --

18  Q.  What day was that?  If you need to refresh your

19  recollection, let me know and I'll direct you to the exhibit.

20  A.  All right.  Direct me to the exhibit.

21  Q.  All right.  Please look at Plaintiff's 30.

22  A.  Well, you cannot see the date.  Oh, you can.  It's November

23  23rd.

24  Q.  Okay.  Of what year?

25  A.  2009.

1   Q.  Okay.  Thank you.

2             In December 2009, had you gotten your Thursday,

3   Friday, Saturday shifts back?

4   A.  I'm sorry?

5   Q.  In December of 2009, after Yuliya Synyuk got your shifts in

6   December of 2009, had you received your Thursday, Friday,

7   Saturday shifts back?

8   A.  No.

9   Q.  In January of 2010, had you received your Thursday, Friday,

10  Saturday shifts back?

11  A.  I don't think so, but I have to look on the schedule

12  because approximately that time --

13            THE COURT:  I don't understand the answer to the

14  question.

15  Q.  Okay.  In December of 2009, you testified that you had not

16  received your Thursday, Friday, Saturday shifts back, correct?

17  A.  Yes.

18  Q.  Were you making less money as a result?

19  A.  Of course.

20  Q.  At some point in February 2010, did you start to get your

21  shifts back?

22  A.  Yes.

23  Q.  Tell us what happened.

24  A.  First of all, in the first place, I was punished.  He --

25            THE COURT:  You were what?

1   A.  He punished me by giving me the worst shifts because I

2   didn't want to-- I was avoiding his approach.  I was denying

3   his attention, so he punished me by taking my shifts away.

4   Q.  When you say "denying his attention," what do you mean?

5   A.  Avoiding.  Avoiding him.  Just joking about it, not doing

6   anything with him when he so many times tells me that he wants

7   me.

8   Q.  Well, let me stop you.

9           As of January of 2010, had you kissed Mr. Marino?

10  A.  Of course not.

11  Q.  Had you had sex with Mr. Marino?

12  A.  Of course not.

13  Q.  Okay.  Now, in February of 2010, something changed with

14  your shifts.

15  A.  Well, as I understand, I --

16  Q.  Did you start working Friday/Saturday shifts?

17  A.  Yes.

18  Q.  In February of 2010?

19  A.  Yes.

20  Q.  Okay.

21  A.  He fired Yuliya Synyuk.

22  Q.  Okay.

23  A.  And I took my-- and I got my shifts back.

24  Q.  And how many days were you working then?

25  A.  I worked 14 days in a row.

1   Q.   Okay.  And did Mr. Marino tell you anything about Yuliya

2   Synyuk at that time?

3   A.   He said that he's going to fire her because she doesn't

4   want to have sex with him.

5   Q.   He said that to you?

6   A.   Yes.

7   Q.   Okay.

8   A.   And I think he got upset because she was planning to get

9   married and she went with her boyfriend, Sergé, on a vacation.

10  So he realized that he's not going to get it, so he fired

11  her.

12  Q.   Get what?

13  A.   He's not going to have sex with her, so he fired her.

14  Q.   Okay.  Now, when you got your shifts back, were you

15  concerned about that at all?

16  A.   I was, but...

17  Q.   Tell me what was going on in your mind when you got your

18  shifts back.

19  A.   Well, I was happy at some point.  I got-- I was not making

20  money and I was kind of suffering paying the bills.  And then I

21  get more days.  I was a little bit relieved.  I don't know.

22  I'm saying at first I was kind of happy.

23  Q.   Okay.  Because you were now making more money again.  Okay.

24        Now, from December 2009, January 2010, all the way

25  through March 2010, was Mr. Marino's conduct still the same

E4NBMIRT                          Mironova - direct

1   with you?

2   A.  Yes, but he was already like-- as time passed and I already

3   saw a lot of things, he would treat me more like a close

4   friend.  So, for example, if he would come and, you know,

5   approach the waitress, he would come to me and brag about it.

6   He would come and say --

7            THE COURT:  I don't understand this testimony at all.

8            MR. KAUPP:  Okay.  I'm asking her if Mr. Marino's

9   conduct towards Tatiana changed in January through March of

10  2010, and she's describing how it changed, if at all.

11           THE COURT:  I did not understand what she is saying.

12  Q.  Would you please answer that question clearly and slowly

13  for the Judge and the jury?

14  A.  Okay.  He treated me a little bit differently.

15  Q.  Into the microphone.

16  A.  He treated me a little bit differently.

17           THE COURT:  He what?

18  Q.  Into the microphone.

19  A.  I understand.

20  Q.  Pull it closer.

21  A.  He treated me-- treated, right?  He acted towards me a

22  little bit differently.

23  Q.  And how was that?

24  A.  He acted as I was his close friend who knows him already by

25  that time.

1    Q.  Okay.

2    A.  So when he, during the shift --

3          THE COURT:  Look, I'm not understanding what she is

4    saying.

5          MR. KAUPP:  Is it the volume or is it something else,

6    your Honor?  Does she need to speak louder?

7          THE COURT:  Well, I'll tell you what.  I'm going to

8    allow you to do some leading.  We've got to get her testimony

9    and the jury has to understand what she is saying here.  And I

10   don't understand what it is she's trying to say Mr. Marino was

11   doing at this period of time.  Was he making advances?  Was he

12   doing this or that?  I don't understand what she is trying to

13   say.

14         THE WITNESS:  Okay.  When he was making-- he threat--

15   he acted to me as his close friend --

16         THE COURT:  Why don't you wait and let your lawyer ask

17   questions.

18         THE WITNESS:  Sorry.

19   BY MR. KAUPP:

20   Q.  So you're saying in February and March of 2010, you became

21   Mr. Marino's buddy?

22   A.  Yes.

23   Q.  And he would come to you and tell you things?

24   A.  Yes.

25   Q.  And he would tell you --

1           THE COURT:  He became her buddy?

2           MR. KAUPP:  Yes, her friend.  She used the term

3    "buddy."  I was repeating her term.

4    Q.  Can you describe what you mean by buddy?

5    A.  Buddy is the person who you share your thoughts, your

6    emotions.  Like a very close friendship.

7    Q.  Okay.  And what sorts of things was he telling you in this

8    time frame?

9    A.  How he did sexual advances to other wait-- to waitresses.

10   Q.  Give us examples of what he said.

11   A.  For example-- it's an example.  I don't know.  What he

12   said, "Did you see that what I did?"  But I had to --

13   Q.  Did you see what I did?  And what was he referring to?

14   A.  For example, whispering in the ear to the girl.  For

15   example, trying to catch the girl in the waitress room or just

16   making a joke about her appearance.  So he would come to me and

17   he would say, "Oh, did you see what I did?"

18   Q.  And what would you say?

19   A.  Different times different-- I was, like, I saw.  And I, you

20   know-- I was trying not to continue conversations like that.  I

21   know where it's-- where it possibly can lead to.

22   Q.  Okay.

23           THE COURT:  The question was, What did you say to him?

24   What did you say to him in response to these remarks?

25           THE WITNESS:  I saw.

```
 1              THE COURT:  What?

 2              THE WITNESS:  I answered "I saw."

 3              THE COURT:  You answered what?

 4              THE WITNESS:  That I saw what he did.

 5              MR. KAUPP:  She saw what he did.

 6              THE WITNESS:  He asked me if I saw what he did to

 7      other waitresses, and I answered "I saw."

 8      Q.  Now, towards the end of March, did something happen?

 9      A.  March?  Yes, Genny Wilson filed lawsuit against Mr. Marino.

10      Q.  Okay.

11              THE COURT:  I didn't understand.  What happened in

12      March?

13      Q.  At the end of March, did Genesis Wilson file a lawsuit

14      against Mr. Marino?

15      A.  Yes.

16      Q.  And was she a former employee at that point?

17      A.  Yes, she was a former employee.

18      Q.  Okay.  Were there other former employees part of the

19      lawsuit, too?

20      A.  Yes.

21      Q.  Okay.  And did you see how Mr. Marino responded to that?

22      A.  Well, he was very upset.

23      Q.  What did he say?

24      A.  That the bitch is trying to sue him.

25      Q.  Okay.
```

E4NBMIRT                          Mironova – direct

1    A.  Sorry for my language.

2    Q.  Is that a direct quote?

3    A.  Yes, it is.

4    Q.  Okay.

5    A.  I wouldn't curse in court, let me tell you.

6    Q.  Now, at some point did you learn about a reality show?

7    A.  Yes, I did.

8    Q.  Would you please tell us what you learned about the reality

9    show?

10              THE COURT:  We need to take our lunch break.  I'll

11   have to interrupt.  2:15.  2:15, please.

12              (Jury excused)

13              (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

1                   A F T E R N O O N   S E S S I O N

2             (In open court; jury not present)

3             THE COURT:  The jury gave a message to Jon Beal.  Why

4        don't you pass that on to the lawyers.

5             THE DEPUTY CLERK:  The jurors say they do understand

6        the witness.

7             MR. KAUPP:  Okay.  Thank you.

8             THE COURT:  Okay.

9             MR. KAUPP:  We're still going to do everything we can,

10       Judge, to make sure that you can hear the witness, though.

11       That's a very important --

12            THE COURT:  That's not important.  But, anyway, I

13       think we're all trying and it's all coming out apparently just

14       fine.

15            MR. CESARATTO:  Your Honor --

16            THE COURT:  Are we going to take a witness?

17            MR. CESARATTO:  Yes.  Your Honor, Mr. Kaupp is going

18       to, with defense consent, at least as to the order, call one of

19       his witnesses out of order.  I have an application to exclude

20       the testimony.  We had addressed it in our *in limine* motion.

21       This particular witness, Natalia Zemtsova, worked at the

22       restaurant from May of 2009 to September of 2009.  She did not

23       overlap employment with the plaintiff.  They didn't work at the

24       restaurant at the same time.  She's going to come in and say

25       that Mr. Marino engaged in certain acts of sexual harassment

E4NBMIRT                    Trial

1    towards her.

2           The fact that she's not a witness to any of the

3    alleged harassment of Ms. Mironova and that they didn't work at

4    the same time, she doesn't have any relevant testimony to give.

5    And even if there was some probative value --

6           THE COURT:  There's always something called the Rules

7    of Evidence.

8           MR. CESARATTO:  Yes.

9           THE COURT:  Let's look at the Rules of Evidence.  What

10   applies?

11          MR. CESARATTO:  Yes.  Your Honor, I would argue that

12   under Rule 401, there's no relevant evidence.  Under Rule 403,

13   even if there was some--

14          THE COURT:  Let's get that open.  Just a minute.

15          What were the rules you mentioned?

16          MR. CESARATTO:  Your Honor, our application would be

17   grounded in Rule 401 in the first instance, and then Rule --

18          THE COURT:  Just a minute.

19          MR. CESARATTO:  Yes.

20          THE COURT:  I'm sorry, I interrupted you.

21          MR. CESARATTO:  Yes, and then Rule 403, because we

22   would argue that this is overly prejudicial.  And we have a

23   Second Circuit case, *Haskell v. Kaman Corp.*, cited at page 16

24   of our original motion, where the Court in substance said,

25   Second Circuit, said "Even the strongest jury instructions

E4NBMIRT                      Trial

1    could not have dulled the impact of a parade of witnesses, each

2    recounting his contention that defendant had laid him off

3    because of his age."

4            So, we would argue that this is overly prejudicial.

5    And since the two of them never overlapped employment anyway,

6    she has nothing relevant to offer.

7            MR. KAUPP:  Your Honor, may I respond?

8            THE COURT:  Just a minute.

9            MR. KAUPP:  Sure.

10           MR. CESARATTO:  Your Honor, I just had one further

11   point as well.

12           THE COURT:  Just one minute.

13           MR. CESARATTO:  Yes.

14           THE COURT:  I'm looking at Rule 405(b).

15           (Pause)

16           THE COURT:  Let's hear from the plaintiff.  What is it

17   you intend to put on?

18           MR. KAUPP:  Your Honor, this witness goes to the

19   hostile work environment claim.  The Second Circuit in *Perry*

20   said "evidence of harassment of other women, if part of a

21   pervasive or continuing pattern of conduct, was surely relevant

22   to show the existence of a hostile work environment" at Ethan

23   Allen and is probative of the notice of the environment for the

24   period that is relevant.

25           Now, first of all, Counsel's wrong in that that they

 1   did overlap by a couple of days, but the hostile work

 2   environment period does not require that it be the exact same

 3   period, just the same time period.  The fact that they

 4   overlapped by a couple of days, we're clearly in the same time

 5   period.

 6         It's also not only relevant to the hostile work

 7   environment-- and, by the way, the Southern District in

 8   *Zubulake v. UBS Warburg* and in *Epstein v. Kalvin* allowed in--

 9   in fact, *Epstein v. Kalvin* also allowed in prior bad acts to

10   show motive and intent, discriminatory intent.  It's also

11   relevant to his intent, how he treated other women.

12         And the Second Circuit and the Southern District are

13   very clear when there's a hostile work environment claim, the

14   treatment of other women is relevant to the hostile work

15   environment claim.  And when there's a discrimination claim

16   based on sex, treatment of other women is relevant to

17   discriminatory intent.

18         And I have the cases for your Honor and the

19   highlighted language and I could bring it to the bench, if

20   you'd like.

21         MR. CESARATTO:  Your Honor, if I may respond to that.

22         THE COURT:  Of course.

23         MR. CESARATTO:  The key part --

24         THE COURT:  A little louder.

25         MR. CESARATTO:  I'm sorry?  Oh, yes.  The key part of

 1    what Mr. Kaupp just said is "during the relevant period of

 2    time."

 3         Let's just go back for a moment to yesterday's

 4    decision of the Court where we discussed the fact that the only

 5    claims left on discrimination are state and city law claims.

 6    Those claims have a three-year statute of limitations.  This

 7    action was filed in March 2013.

 8         Everything before March 2010 is time barred.  And what

 9    Mr. Kaupp is proposing to do now is go back to May 2009 and

10    September 2009 and bring in other testimony outside the

11    limitations period saying that it's relevant to how Mr. Marino

12    acted after that.

13         It's not relevant.  And, in fact, Ms. Mironova

14    testified during her deposition that she didn't even know

15    Natalia Zemtsova.

16         MR. KAUPP:  Your Honor, that completely disregards the

17    continuing violation doctrine, which says "where specific and

18    related incidences of discrimination are permitted by the

19    employer to continue for so long as to amount to a

20    discriminatory policy or practice, it's permissible to go

21    beyond the statute of limitations to bring in that evidence of

22    the discriminatory conduct."  And that's what we're doing under

23    the continuing violation doctrine.

24         These witnesses will testify to the same exact

25    treatment which shows that it's a policy or a pattern of

1    conduct.  That's entirely consistent.

2           MR. CESARATTO:  Your Honor, there's been --

3           MR. KAUPP:  Let me just finish, Counsel.

4           MR. CESARATTO:  Sure.

5           MR. KAUPP:  That's the *Cornwell* case, *Cornwell v.*

6    *Robinson*, Second Circuit 1994.

7           MR. CESARATTO:  Your Honor, there's never been any

8    allegation or theory of continuing violation.  The allegations

9    in this case are harassment starting at the time when plaintiff

10   began her employment.  This witness worked in the months prior

11   to that.

12          THE COURT:  Just a minute, please.

13          (Pause)

14          MR. CESARATTO:  Your Honor --

15          THE COURT:  Just a minute.

16          MR. CESARATTO:  Yes.  I'd just like to add one thing.

17          (Pause)

18          THE COURT:  Well, let's look at Evidence Rule 404,

19   404(b), "Crimes, wrongs or other acts."

20          "Evidence of a crime, wrong or other act is not

21   admissible to prove a person's character in order to show that

22   in a particular occasion or on a particular occasion, the

23   person acted in accordance with the character."

24          Then it goes on, "Permitted uses."  "The evidence may

25   be admissible for another purpose, such as proving motive,

E4NBMIRT                    Trial

1    opportunity, intent, preparation, plan, knowledge, identity,"

2    and so forth.

3           It seems to me that this evidence is admissible under

4    the language I've just spoken of about plan, intent.

5    Particularly intent.

6           Also, I do agree that evidence of hostile work

7    environment is not really limited to the time when the

8    plaintiff was there.  To say that the evidence of hostile work

9    environment could only be introduced about things that went on

10   when the plaintiff was there would be really an unreasonable

11   restriction on admissibility.

12          So the objection is overruled.

13          Now, do we have a witness?  When is this witness going

14   to testify?

15          MR. KAUPP:  Right now, your Honor.  She's right here.

16   She's ready to go.

17          THE COURT:  All right.

18          MR. KAUPP:  There was one issue, other issue,

19   regarding a joint stipulation for evidentiary issues relating

20   to exhibits that counsel had presented to the Court.  I don't

21   know if the Court has had an opportunity to review it.

22          THE COURT:  Well, it all looks fine.

23          MR. KAUPP:  Okay.

24          THE COURT:  Let's bring in the jury and have the

25   witness.

E4NBMIRT                        Trial

 1              MR. KAUPP:  Thank you, your Honor.

 2              Your Honor, the prior witness left a few things up

 3    there.  May I just retrieve them?

 4              THE COURT:  Oh, yes, please.

 5              (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court; jury present)
 2                THE COURT:  The testimony of Ms. Mironova will be
 3      interrupted to call another witness because of scheduling
 4      difficulties.
 5                All right.  Let's have the other witness.
 6                MR. KAUPP:  Thank you.
 7                The plaintiff calls Natalia Zemtsova.  Apparently
 8      she's waiting outside, your Honor.
 9                THE COURT:  Sure.
10                MR. KAUPP:  And, your Honor, I should tell the Court
11      that Ms. Zemtsova is a plaintiff in another matter against the
12      defendants and her attorney is here with her.  He asked me if
13      he could sit at one of the counsel tables while she testified.
14                THE DEPUTY CLERK:  Please step up and remain standing.
15                MR. KAUPP:  His name is Robert Wisniewski, your Honor.
16                THE COURT:  Come and sit wherever you would like to
17      sit.
18                THE WITNESS:  Thank you.
19       NATALIA MILLER,
20           called as a witness by the Plaintiff,
21           having been duly sworn, testified as follows:
22                THE DEPUTY CLERK:  Please state your full name for the
23      record and spell your first and last name.
24                THE WITNESS:  Natalia Miller.  N-a-t-a-l-i-a, and last
25      name is M-i-l-l-e-r.
```

E4NBMIRT                         Trial

1           THE DEPUTY CLERK:  Thank you.

2    DIRECT EXAMINATION

3    BY MR. KAUPP:

4    Q.  Good afternoon, Ms. Miller.

5    A.  Good afternoon.

6    Q.  My name is Gordon Kaupp and I represent the plaintiff,

7    Tatiana Mironova.

8           Was your name formerly Natalia Zemtsova?

9    A.  Yeah, that's correct.

10   Q.  I'm sorry, could--

11          THE COURT:  How do you spell that?

12          THE WITNESS:  Z-E-M-T-S-O-V-A.

13   Q.  And when did your name change?

14   A.  In August of 2011, when I got married.

15   Q.  Okay.  Thank you.  Forgive me for referring to you

16   throughout as "Natalia Zemtsova."

17   A.  That's okay.

18   Q.  And where were you born?

19   A.  I was born in Russia, in the City of Novocherkassk,

20   N-o-v-o-c-h-e-r-k-a-s-s-k.  That's a long name.

21   Q.  And what's your birth date?

22   A.  My birthday is September 18th, 1985.

23   Q.  Okay.  And are you currently employed?

24   A.  Yes, sir.

25   Q.  Where do you work?

E4NBMIRT                    Miller - direct

1   A.  I work for the United Nations.

2   Q.  And what do you do for the United Nations?

3   A.  I provide administrative support for the Department of

4   Peacekeeping Operations.

5   Q.  And thank you for agreeing to appear here today and take

6   time out of your schedule.

7   A.  My pleasure.

8   Q.  When did you come to the United States?

9   A.  First time I came in June 2006 for few months, and then I

10  came back and stayed in August of 2008.

11  Q.  Are you familiar-- well, are you familiar with DaMarino's

12  Restaurant?

13  A.  Yes, sir.

14  Q.  And how are you familiar with DaMarino's Restaurant?

15  A.  I was employed there for about three and a half months.

16  Q.  Okay.  When did you start your employment with DaMarino's?

17  A.  Approximately the middle of May of 2009.

18          THE COURT:  A little slower.  When did you start?

19          THE WITNESS:  Approximately in the middle of May of

20  2009.

21  Q.  And when did your employment end?

22  A.  In the first week of September of 2009.

23  Q.  Prior to --

24          THE COURT:  First week of what?

25          THE WITNESS:  September.

1    Q.  Prior to today, have you seen-- ever seen Tatiana

2    Mironova?

3    A.  I've seen her I believe once or twice in the restaurant.

4    Q.  Okay.  And did you overlap with her those one or two times?

5    A.  We never worked together, but I believe she was on training

6    when I was about to get fired.

7    Q.  Okay.  Now, how did you come to find out that-- strike

8    that.

9         You applied for a position at DaMarino's Restaurant?

10   A.  No, sir.  Mr. Marino recruited me when I was working at the

11   restaurant next door.

12   Q.  How did --

13        THE COURT:  When what?

14        THE WITNESS:  When I was working at the restaurant

15   next door, right next door, Serafina.

16   Q.  And how did he recruit you?

17   A.  He came there when I was a hostess in the front.  He

18   started telling me-- basically asking me questions about my

19   life, about how I came to New York City, and telling me that

20   his restaurant also needed a waitress and there would be more

21   money, there would be better shifts than in Serafina.

22   Q.  What questions-- you said he was asking you questions about

23   your life.  What questions was he asking you?

24   A.  He was trying to find out my financial situation; asking me

25   how I was supporting myself in New York City, basically.  If I

1    was in school; if I was, you know, married or not; if I had a

2    boyfriend or not; if I lived with a roommate or not.

3    Q.  Okay.  And what did you tell him?

4    A.  I told him the story, that I came here by myself and my

5    family was home back in Russia.  I was in graduate school.

6    Maybe not one day, but during the first week of-- you know,

7    since we met, he knew basically the story.

8    Q.  And at some point you agreed to start working at DaMarino's

9    Restaurant?

10   A.  I was interested because I really needed money to pay my

11   tuition, yes.  So I stopped by after my shift, which was about

12   10 p.m.  I came to DaMarino, which was next door.  He offered

13   me some expensive pasta and a glass of wine, I believe, and he

14   kept talking about myself and how-- how good I would look in

15   that restaurant for the future reality show that he was trying

16   to organize.

17   Q.  Did he tell you how much more you'd be making at his

18   restaurant?

19   A.  He showed me the book where they were keeping records of

20   the tips so that I could get an idea about numbers, about how

21   much each waitress was making every night, yeah.

22   Q.  And was that more than you were making at the other

23   restaurant?

24   A.  In the other restaurant, I was working mostly lunches.  And

25   he offered me dinner shift, which was a big difference.

E4NBMIRT                      Miller - direct

1  Q.  And so you took the position?

2  A.  I was there part time for the first couple of weeks, so I

3  was combining two places, and then I moved to DaMarino full

4  time.

5  Q.  Tell us about the dinner where he offered you wine and an

6  expensive pasta.  Do you recall any of the conversation that

7  you had?

8  A.  Well, in the beginning of my employment, for the first

9  couple of months, Mr. Marino was particularly interested in

10  having sexual relationship with me.  Because he was repeatedly

11  inviting me to the round table, which he had in the restaurant,

12  which was called Marino table.  Not for customers.  He would

13  frequently seat me there during my training or during my shift.

14  He would sit me there, offering me expensive food from the menu

15  such as Branzino or expensive pasta or desserts.  And he

16  would-- I'm sorry.

17  Q.  And just-- I know you're nervous and you're doing well and

18  we can all understand you, but just take it easy and slow down.

19  Okay?

20  A.  Sorry.

21  Q.  And we'll get to whatever it is you want to say.

22          Can you tell me -- we need to know examples.  Do you

23  remember some of the things he said to you during this time?

24  A.  Yes.  He was constantly complimenting me about my

25  appearance, about my long legs, about my eyes, about Slavic

E4NBMIRT                    Miller - direct

1   appearance in general.  Making frequent comments about how

2   Russian women are more beautiful.  Ukrainian, Polish, how nice

3   they look.

4   Q.  What did he say he liked about these types of women, if

5   anything?

6   A.  He liked the appearance.  He liked the long legs.  He liked

7   the height of those women, the skin.  All sorts of things.  He

8   was constantly talking about us, you know, becoming lovers,

9   especially --

10  Q.  How would he say that to you?

11  A.  In a number of ways.  He would invite me to his house in

12  Connecticut, which was not his house but he could access-- had

13  access to that mansion.  He was constantly describe me how good

14  we would look together in that pool and how we could go there

15  and be alone, stay naked like Adam and Eve.  And he was

16  commenting about my legs.  He said, Oh, you know, I like long

17  legs because if we have sex, you can wrap them around me like a

18  pretzel, or something like that.

19  Q.  And how many times did he say-- did he invite you to the

20  Connecticut house?

21  A.  On and off bunch of times, especially through first couple

22  months of my employment.  Because I believe he lost interest in

23  me closer to August, and then he gave more attention to

24  September and initially I got fired.

25  Q.  So in the beginning it was a lot more constant?

E4NBMIRT                          Miller - direct

1    A.  Yes.

2    Q.  Okay.  And --

3              THE COURT:  Did you go to Connecticut?

4              THE WITNESS:  No, absolutely not.

5    Q.  How many times did he say the comment about the long legs

6    wrapped around like a pretzel?

7    A.  He was complimenting on my legs a number of times, too

8    numerous to list.  And those comments about us having sex

9    potentially were pretty disgusting, I must say.

10             THE COURT:  Were potentially what?

11             MR. KAUPP:  About them potentially having sex "were

12   pretty disgusting, I must say," I believe is what she said.

13             THE COURT:  I didn't get that.  What did he say along

14   that line?

15             THE WITNESS:  He was fantasizing in front of me that

16   it would be nice if my legs would be wrapped around him if we

17   had sex.  Something like that.

18             THE COURT:  Okay.

19             THE WITNESS:  I heard that couple of times.

20   Q.  Did he ever whisper in your ear?

21   A.  Yes, sir.

22   Q.  Could you please describe the manner in which he would

23   whisper in your ear?

24   A.  Well, throughout the first couple of months of my

25   employment, he would constantly get me-- approach me in the

1    corner of the restaurant by the bar or by the waitress room,

2    where there would be no camera surveillance.  And he would get

3    into my personal, intimate space, get in close to me and trying

4    to touch me, on my waist, on my arm, and say something about,

5    you know, potential-- our potential relationship, about how I

6    would benefit financially from being his mistress, which was

7    especially unpleasant.

8    Q.  What did he say about you being his mistress if you

9    recall?

10   A.  During the first couple of weeks of my-- when I just got

11   there.  So the more he learned about my financial situation,

12   the more he would say, "Oh, if you were little bit smarter, you

13   would not have to work that hard in my restaurant," which I

14   understood for myself was the offer to become his mistress and

15   move to this apartment downtown Manhattan, where he would visit

16   me or, you know, get better shifts, get more money or whatever

17   was...

18   Q.  What apartment in downtown Manhattan?

19   A.  Oh, there was a famous apartment on, I believe, Pearl

20   Street where he had access to it so he could put his favorite

21   wait staff or bartenders to live for very low money, if not for

22   free, which basically means he would be able to visit them,

23   those people, and I assume to have sex.

24   Q.  Do you know anyone that lived in the Pearl Street

25   apartment?

1   A.  I know that Ms. Natalia Odegova did, the bartender.  So he

2   offered me to become her roommate.  I know that subsequently

3   Ms. Gen Wilson moved there and they were roommates for some

4   time.

5   Q.  Genesis Wilson?

6   A.  Yes.

7   Q.  And Natalia Odegova?

8   A.  Yes.  Natalia lived there all the time throughout my

9   employment as far as I know.

10  Q.  You mentioned touching your hands and your waist.  I don't

11  recall if you mentioned him touching your legs.  Did he ever

12  touch your legs?

13  A.  I don't think so.

14  Q.  Okay.  Did he ever make-- did he ever refer to you as filet

15  mignon?

16  A.  Yes, sir.

17  Q.  Can you please describe what he said?

18  A.  Okay.  So on one of the occasions when he was trying, you

19  know, to keep talking about our potential relationship, I

20  mentioned his wife.  I said, "How about the fact that you are

21  married?"  And so then he said to me that, you know, wife is

22  like a pasta that you can have every day.  It's, like, boring.

23  But the man, once in a while you always want to have lamb chops

24  or filet mignon, which were the most expensive dishes in our

25  restaurant.  Just it's on the menu.

```
 1            So he compared me to filet mignon, which is the most

 2   expensive dish in our restaurant.  And I felt pretty cheap to

 3   be compared to the expensive piece of meat.

 4   Q.  Did he say that on more than one occasion or just once?

 5   A.  I think filet mignon was just one occasion, but it was

 6   enough.

 7   Q.  Okay.

 8   A.  I felt very sorry for myself.

 9   Q.  And I had asked you before, I don't think I got the answer,

10   when he would whisper to you, how would he do that?

11   A.  Like, quietly.

12   Q.  I mean, like, physically.  Did he ever touch his lips to

13   your ear?

14   A.  Well, I think Mr. Marino's a little bit short to touch my

15   ear because I'm 5'11 tall, sir.  So he tried, but --

16            THE COURT:  I didn't understand your answer.

17            THE WITNESS:  I believe Mr. Marino's too short to

18   touch my ear because I'm 5'11 tall, sir.  So maybe he tried,

19   but the shoulder...

20   Q.  Okay.  You had mentioned the reality show.  Did he tell you

21   anything about a reality show?

22   A.  Yes.  There was this project that he was about to run, a

23   reality show based on the restaurant business.  So he was

24   specifically mentioning he would try to recruit more beautiful

25   people so that they would look better for the reality show for
```

1   the commercial purposes.

2   Q.  Were you ever filmed for that?

3   A.  No.  I tried to avoid that.

4   Q.  Did he ever tell you he would make you a star?

5   A.  Yeah, something like that.

6   Q.  About how many times?

7   A.  Maybe three, four times.  I don't know.  In the beginning.

8   But then they actually started filming the teaser closer to

9   August, I believe.

10  Q.  The what?

11  A.  They started filming the teaser.

12  Q.  Oh, the teaser.  The pilot.

13  A.  The pilot more towards the end of my employment, but

14  Mr. Marino was not that interested, I guess.  So if I would

15  avoid it, it would be fine.  He would not really be hurt.

16  Q.  And did you say that sometimes he would have you come and

17  sit at his table while you were working?

18  A.  Yes, especially in the beginning of my employment.  He

19  was-- he would even take me to throw out my training, sit me

20  down at the table and offer me food and wine and desserts.  But

21  then I realized that after couple of months, when he lost hope,

22  I stopped receiving the privilege food.  When I call "privilege

23  food," I mean more expensive food.

24          Because most of the wait staff and busboys were

25  entitled to pasta generally during the day, but some special

1   people -- women -- very expensive filet mignon, Branzino,

2   whatever they wanted every night.  But I guess I was

3   privileged for the first couple of months, I would say, and

4   then I was crossed out because he realized it would take

5   forever to...

6   Q.  After those first couple of months, did his treatment

7   towards you change in any other way?

8   A.  Well, he was very passionate in the beginning, and then it

9   started to change towards the end.  Yeah, like -- I'm not sure

10  if I understand exactly what you asking.

11  Q.  And I may have asked a poor question.

12          Did he treat you differently after the first couple of

13  months?

14  A.  Yeah.  I realized towards the end of my employment, which

15  was July-- which was August, and especially the beginning of

16  September, he started losing interest in me, so he would not

17  invite me to the round table anymore.  And one time I asked if

18  I could order something more than pasta and I was told no

19  basically.  I was just told that it's not-- you know, it's

20  full.  But Ms. Odegova, yes.

21  Q.  "But Ms. Odegova, yes," is that what you said?

22  A.  Yes.  Yes, he indicated that Ms. Odegova or Ms. Wilson

23  would have whatever they wanted, but for the rest of people,

24  pasta would be totally fine.

25  Q.  Did Mr. Marino ever invite you into the back office?

1    A.  Yes, sir.

2    Q.  And how many times did he do that?

3    A.  A number of times, especially-- again, especially in the

4    beginning of my employment.  Because back office is a secluded

5    area.  Very, very small, even for two people to be inside.

6    Q.  And what would happen when you went into the back office?

7    A.  He would smoke hashish in front of me or marijuana,

8    whatever it was, and keep talking about my financial situation

9    and then slowly moving towards our relationship, about how I

10   would benefit financially from becoming his mistress and things

11   like that.

12   Q.  Okay.  And would he keep the door open or closed or it

13   changed?

14   A.  I think for the most times it was closed because it was

15   connected directly to the kitchen.  So the kitchen workers

16   could-- you know, they could see or hear.

17   Q.  Did he ever tell you to wear certain things to work?

18   A.  The uniform, but it was black bottom and white top in

19   general.  But when I was wearing, like, pants, he wasn't really

20   happy.  He mentioned that-- a couple of times he mentioned that

21   a skirt look better.  If I wear skirt, he says, "Oh, this looks

22   nice on you because you have beautiful legs."  Something like

23   that.

24   Q.  And did you ever make complaints to Mr. Marino about how he

25   was treating you?

1    A.  Yes.  I was mostly complaining about our wages, about

2    unpaid overtime.  But I didn't want to complain about the

3    harassment because I didn't want to lose my job.  I was always

4    denying it, but I was -- I tried to just remind him about the

5    fact that he was married, but not much.

6    Q.  Okay.  And did you ever observe him, how he treated other

7    female employees at the restaurant?

8    A.  Yes, an everyday basis.

9    Q.  And what did you observe?

10   A.  It was similar to my treatment.  If Mr. Marino was

11   interested in one of those new coming waitresses or hostesses,

12   he would sit them at the round table, offer them food and--

13   actually not only the employees, but sometimes patrons of the

14   restaurant.  Sometimes women after the Broadway show, he would

15   invite them for desert at the round table again.

16           But then people, if they would not responding to his

17   advances, they got fired or they stopped receiving those

18   champagne and other things or they just-- or they quit

19   themselves.

20   Q.  Did he do this to the male employees?

21   A.  I never observed such.  Besides, you know, some friends of

22   course who were visiting, but not like Mr. Rossi.  They were

23   having dinners together.  But some other friends, but not

24   busboys or...

25   Q.  And what other women-- who worked with you at the

1   restaurant?  What other women worked with you?  Their names,

2   please.

3   A.  For the most part it was Genesis Wilson, it was Natalia

4   Odegova, it was Barbara Luberadzka.  It was Simoné, but he was

5   not a woman.  It was a waitress Maria, but she left it for

6   maybe a month, maybe a little bit more.  There was a girl from

7   Hungary, Adriana, but, again, she wasn't there for very long.

8   Maybe couple of seasonal girls who were, like, on J-1 visa.

9   Q.  From where?

10  A.  From Soviet-- well, former Soviet Union countries like

11  Russia or Ukraine.

12  Q.  You said Adriana was from Hungary.  Do you know where Maria

13  was from?

14  A.  Maria was from Russia, because I was training her.  Russia.

15  Q.  You mentioned Barbara.  What's her last name?

16  A.  Luberadzka.

17  Q.  Can you spell the last name?

18  A.  It's in the complaint.  It's a Polish spelling.  I might be

19  wrong.  L-U, but I might be wrong.

20  Q.  Do you know if she's Polish?

21  A.  She's Polish.  She lives in New York City for a long time,

22  yeah.

23  Q.  And Natalia Odegova, do you know what her background is?

24  A.  She's from Saint Petersburg, Russia.

25  Q.  And Genesis Wilson, where's she from?

1   A.  Originally from Kiev, Ukraine, but she's been living in New

2   York City since she was 12 or 13.

3   Q.  Okay.  And did you observe Mr. Marino with Ms. Odegova on

4   any occasion?

5   A.  I saw them talking all the time, because she was a barmaid

6   and he was sitting her at the round table as well.  And after a

7   few weeks, I started getting the impression that they were

8   closer than just employer and employee.

9   Q.  What gave you that impression?

10  A.  Well, the fact that she was always privileged.  She was

11  always sitting at the round table or getting whatever food she

12  wanted.  The fact that, you know, she was getting all the

13  shifts that she wanted.  The shifts.

14  Q.  Okay.  The shifts.

15  A.  The fact that she lived in that apartment downtown

16  Manhattan, presumably for very low money, for free.  And I had

17  an impression that he was visiting her at that apartment.  And

18  I also heard it from Ms. Gen Wilson, when they became

19  roommates.

20  Q.  Did you ever go to that apartment?

21  A.  No.  Absolutely not.

22  Q.  What was it like-- I know you touched on it, but what was

23  it like to have Mr. Marino, especially during the first couple

24  of months, giving you all this unwanted attention?

25          THE COURT:  What was the question?  What is the

1    question?

2    Q.  What was it like for you, especially the first couple of

3    months, while Mr. Marino was giving you all this unwanted

4    attention?

5    A.  It was very unpleasant.  I felt very cheap.  I felt very

6    sorry for myself, that I had to tolerate this employment

7    because of my financial situation, because I had to pay my

8    tuition fee and I couldn't just leave this job.  And I just was

9    going to this restaurant to work.  I wasn't there because of,

10   you know, filet mignon.

11          And I felt bad because his wife, Izabela, with their

12   little baby, was there all the time.  Not all the time, but she

13   was there frequently because they live upstairs.  So I observed

14   her, and then I observed Mr. Marino treating other female

15   employees when she was not there.  And Izabela is about my age,

16   okay.  She came from Poland, like me.  From Russia.  So I felt

17   very bad for her.

18          So it was not pleasant work environment.  Absolutely

19   not.

20   Q.  Did you get along with Mrs. Marino?

21   A.  She was always very nice with us.  I never tried to become

22   friends with her, but she was always nice and I cannot say

23   anything bad about her.  I felt sorry for her, generally, but I

24   never spoke with her.

25   Q.  Did you ever tell her what was going on?

1  A.  No, sir.

2  Q.  Why not?

3  A.  I felt like it was not my business to tell her about her

4  husband's, you know, sympathies.

5  Q.  And at some point did your employment at DaMarino's come to

6  an end?

7  A.  I'm sorry, what was the question?

8  Q.  At some point did your employment at DaMarino's come to an

9  end?

10  A.  Yes.  Initially I was displaced, yes.

11  Q.  Can you please describe how your employment ended at

12  DaMarino's?

13  A.  Okay.  Approximately in August, in the end of August 2009,

14  I learned from my managers, from headwaiters, about the new

15  rule.  So now we have to come for lunch shift at 10:30 instead

16  of 11 a.m.  And I would like to mention that the restaurant

17  would open for lunch at noon and technically the person only

18  has to set up the bar, which takes 15 minutes.

19          So we had to be there one hour before --

20  Q.  Slow down.  Slow down.

21  A.  I'm sorry.

22  Q.  That's okay.

23  A.  So before we would have to be in the restaurant one hour

24  before it opens to set up the bar, which was okay.  But then I

25  learned that we would have to come at 10:30 instead to do the

1    same thing.  So we were not getting paid for that time at all.

2    We were not getting paid overtime.  And I was complaining to

3    Mr. Marino about that on a number of times.

4            And then I ask him exactly -- oh, one day, I believe

5    it was September 6 of 2009, I showed up at the restaurant by 11

6    instead of 10:30, and he didn't allow me to work that day.  He

7    told me to go home because he was upset.

8            And then about two days later or three days later, I

9    stopped by the restaurant to pick up my paycheck.  And I ask

10   him directly:  What exactly we are expected to do for this one

11   hour and a half for free?  Can you please specify our duties of

12   the waitress?  And it was in front of some other wait staff.

13           So he told me-- what did he tell me?  I don't remember

14   exactly, but then later on he told people that I spread

15   poisonous spirit in his restaurant behind my back.

16           And then when I came to work on September-- I believe

17   it was September 11th, two days later, I was not allowed to

18   work that day.  And I already saw somebody else working my

19   shift, and possibly was Tatiana.  I might be wrong.

20   Q.  Okay.  And I forgot to ask this before:  After the first

21   couple of months, the more intense attention that you got from

22   Mr. Marino, did your shifts change at all as your employment

23   continued?

24   A.  Well, he would force me to work more lunches.  Lunch is a

25   time when you don't make money, basically, because it's a

1   dinner restaurant.  It's a dinner place.  So before that I was

2   working mostly dinners, including Fridays and Saturdays, which

3   was good, but in August we started more of this lunch deal so I

4   had to have more lunches.

5   Q.  And were you-- sorry.

6   A.  But I was still working four, five, six days a week.

7   Q.  Okay.

8   A.  Maybe a little bit less, I'm sorry.  Maybe a little bit

9   less than before.

10  Q.  Were you working less dinners at that time?

11  A.  Maybe one or two dinners less, but I'm not sure.  I need to

12  go to the records.

13  Q.  Were you making less money as a result?

14  A.  I believe so.

15  Q.  Okay.  Did you ever see-- did Mr. Marino ever yell at you

16  or scream at you?

17  A.  I wouldn't say so, no.

18  Q.  Did you ever see him break plates or glasses?

19  A.  No.

20  Q.  Okay.  Did you ever see him yell at other employees?

21  A.  I do not recall such thing.  Maybe in the kitchen sometimes

22  when it was busy and tense maybe, but maybe most likely Italian

23  to Spanish-speaking workers.

24          MR. KAUPP:  I don't think I have any more questions.

25  Let me just take a look.

E4NBMIRT                    Miller - direct

 1              (Pause)

 2              MR. KAUPP:  I have no more questions for this witness,

 3     your Honor.

 4              THE COURT:  Any cross?

 5              MR. CESARATTO:  Yes, your Honor.

 6     CROSS-EXAMINATION

 7     BY MR. CESARATTO:

 8     Q.  Ms. Zemtsova -- is that the correct pronunciation or should

 9     I call you Ms. Miller?

10     A.  Ms. Miller will be more convenient.

11     Q.  Ms. Miller, my name is Brian Cesaratto.  I'm the attorney

12     for Pasquale Marino and Peter Rossignuolo and DaMarino's.

13              You're a plaintiff in another action in this court,

14     isn't that right?

15     A.  That's correct, sir.

16     Q.  And you've sued Mr. Marino and his restaurant in that

17     action, isn't that correct?

18     A.  That's correct.

19     Q.  And how much money are you seeking in that case?

20              THE COURT:  I couldn't understand the question.

21     Q.  How much money are you seeking from Mr. Marino in your

22     lawsuit?

23     A.  I don't know exactly.  It's a total number.  I don't know

24     if we allowed to discuss it here.  I'm not sure.

25     Q.  I'm asking you how much money are you seeking from

```
 1   Mr. Marino in your lawsuit?
 2             MR. KAUPP:  I'll object to a lack of foundation, your
 3   Honor.
 4             MR. CESARATTO:  It goes to bias, your Honor.
 5             THE COURT:  What is that lawsuit about?  What is the
 6   claim?
 7             THE WITNESS:  It is unpaid wage, unpaid overtime,
 8   hostile working environment, and sexual harassment.
 9             THE COURT:  A hostile work environment?  Are you
10   joined with other people in that lawsuit?
11             THE WITNESS:  Yes, it is a class action, sir.
12   BY MR. CESARATTO:
13   Q.  So you're joined in another lawsuit in this court, that's
14   correct?
15   A.  I initially started with two other plaintiffs and then
16   other people joined.
17   Q.  Okay.  You're joined with two other plaintiffs.  One of
18   those is Genesis Wilson?
19   A.  Another one is Alexandra Kulesh.
20   Q.  And Genesis Wilson is another waitress at the restaurant?
21   A.  She was a hostess and then she became a waitress.
22   Q.  She's a friend of yours?
23   A.  Not really.  We're close, but we're not friends.
24   Q.  You're close but not friends?  What's the difference
25   between being close and being friends?
```

1          THE COURT:  Don't get into that.  Next question.

2    Q.  Well, you and Genesis Wilson and another waitress are

3    represented by Mr. Wisniewski, who's in this courtroom?

4    A.  Mr. Wisniewski.

5    Q.  Is that correct?

6    A.  That's correct.

7    Q.  Okay.  And did Ms. Mironova ever speak to Mr. Wisniewski to

8    your knowledge?

9    A.  Yes.

10   Q.  When did that happen?

11   A.  I'm not sure.  Maybe a year or two years ago, when she came

12   to seek legal advice, but I'm not sure about the date.

13   Q.  Okay.  And how do you know about that?

14   A.  Because my attorney had told me so.  He didn't disclose the

15   details, but I know the general story.

16   Q.  And when did you come to the United States?

17   A.  The second time I came in the end of August of 2009.  Oh,

18   I'm sorry, 2008, right before the financial crisis.

19   Q.  And when did you go to work?

20   A.  Well, I got my first job in-- my first full-time job in

21   January of 2009, and then my second job was DaMarino's

22   Restaurant.

23   Q.  And when you came to work in-- how did you come to the

24   United States?

25   A.  I'm not sure if I understand the nature of your question.

E4NBMIRT                        Miller - cross

1    Q.  Did you travel on a visa?

2    A.  I came on a visa, yes.

3    Q.  What type of visa?

4    A.  I was advised by my attorney not to disclose my immigration

5    situation.

6    Q.  You didn't come legally to the United States?

7              MR. KAUPP:  Objection, your Honor.  Under Rule 26,

8    I'll object that this is unduly burdensome --

9              THE COURT:  I didn't understand the question.

10             MR. KAUPP:  He's asking her if she came to this

11   country illegally.  I'm making an objection under Rule 26.

12             MR. CESARATTO:  Your Honor, it goes to credibility and

13   motive.  She's got a substantial lawsuit against the

14   plaintiffs-- I mean against the defendants in this case and I'd

15   like to know if she came to this country legally or not.

16             MR. KAUPP:  Maybe we should have a sidebar, your

17   Honor.

18             THE COURT:  Let's pass that question, please.

19             THE WITNESS:  I would like to make a remark.  There is

20   no way from Russia to come here illegally, because it's not

21   Mexico.  You have to take a plane and you have to pass the

22   customs.

23             MR. CESARATTO:  Your Honor, she opened the door and I

24   should be allowed to ask her questions about how she came to

25   the United States.

E4NBMIRT                        Miller – cross

```
 1              THE COURT:  Let's pass that issue now.  Do you have
 2     anything else about what she testified to on direct?
 3              MR. CESARATTO:  Yes, your Honor, I do.
 4              THE COURT:  All right.  Go ahead.
 5     BY MR. CESARATTO:
 6     Q.  Ms. Zemtsova, you worked from May 2009 to September of
 7     2009?
 8     A.  Yes.
 9     Q.  Did you ever observe Ms. Mironova being sexually harassed
10     by Mr. Marino?
11     A.  As I mentioned previously, I only saw Ms. Mironova
12     briefly, once, in September of 2009, when I was about to get
13     fired.
14     Q.  And --
15     A.  And she was only on training, first or second day.
16     Q.  And --
17     A.  Never worked with her.
18     Q.  I'm sorry.  Are you done?
19     A.  Yes.
20     Q.  And that one time --
21              THE COURT:  Did you resign from the job or were you
22     terminated?
23              THE WITNESS:  I was terminated.
24              THE COURT:  All right.
25     Q.  Did you ever observe Ms. Mironova being sexually assaulted
```

1    by Mr. Marino?

2    A.  I only saw Ms. Mironova in that restaurant once or twice in

3    my life.  And, no, I didn't see her being harassed.  She was on

4    training folding napkins instead of me.

5    Q.  And you asked Mr. Marino to be a guarantor on a lease?

6    A.  Yes, but it was towards the end of my employment.  And

7    Mr. Marino initially said, "Yes, of course, my sweetheart," and

8    then he changed his mind after couple of weeks when I actually

9    came to him with the paper.

10   Q.  So despite the fact that you say he harassed you, you went

11   to him and asked him to be a guarantor on your lease?

12   A.  I didn't have any family members in the United States or

13   any friends who would potentially be able to guarantee my

14   lease.  And Mr. Marino was my employer, the only employer at

15   the time, so I would like him to sign the paper stating how

16   much money I was making.  That's it.

17   Q.  Did Mr. Marino ever assault you?

18   A.  I'm sorry?

19   Q.  Did Mr. Marino ever assault you sexually?

20   A.  He was --

21           MR. KAUPP:  I'll object to the question that it's

22   vague.

23           THE COURT:  Overruled.

24           THE WITNESS:  So I have to answer it?

25           THE COURT:  Yes.  Were you ever-- the question was,

1    did he ever assault you?

2    A.  I'm sorry, how do you define the word "assaulting" just to

3    be clear?  I'm not sure if I understand this correctly.

4    Q.  Well, did he ever forcibly-- did he ever use force with you

5    for sex?

6    A.  No.

7    Q.  And after your employment ended at the restaurant, you came

8    back to the restaurant, isn't that right?

9    A.  It is not correct.  I stopped by once in, I believe,

10   December, but it was just once because I had a reason to.

11   Q.  So you did come back after your employment ended to the

12   restaurant, correct?

13   A.  Yes.

14   Q.  And you came back to ask for a meal?

15   A.  I was babysitting a girl who was hungry at that time.  So

16   we were walking around and she was hungry.  I didn't have money

17   to feed her so I decided to stop by and ask-- I called the

18   restaurant and I asked the manager if I would be able to get

19   some pasta for her.  And he said, "Yeah, no problem, stop by."

20   She had cheap pasta and I had glass of water.  That's it.

21          And I believe there was a second time in my life when

22   I saw Ms. Mironova behind the bar.

23   Q.  Okay.  But Mr. Marino was present the time you came back

24   for the meal?

25   A.  Unfortunately, he passed by.  Because when I called the

1    restaurant, he wasn't there.  I specifically asked if he would

2    be present.

3    Q.  But you had no problem going back to the restaurant to get

4    a meal after your employment ended?

5    A.  I didn't feel comfortable seeing him, but I was in good

6    relationship with the people I used to work with.

7    Q.  Are you aware whether Ms. Mironova signed a declaration in

8    your lawsuit?

9              MR. KAUPP:  Objection; relevance.

10             THE COURT:  Sustained.  We'll get-- if that's to come

11   up, it will come up in a different way.  The objection is

12   sustained.

13   Q.  Now, what other employees did you hear Mr. Marino

14   proposition for sex?

15   A.  I'm sorry, are you asking about me hearing Mr. Marino

16   asking other employees to have sex with him?

17   Q.  I'm asking during the time that you worked there, what

18   other employees did you hear that Mr. Marino spoke to and

19   propositioned for sex?

20   A.  I don't think I heard directly asking them to have sex

21   because that's the type of question you usually whisper or you

22   try to be one on one.

23   Q.  So to the extent you saw Mr. Marino whisper in the ear of

24   other waitresses, you don't know what was said, do you?

25   A.  No.  But based on body language and the treatment of those

E4NBMIRT                    Miller - cross

1    women, again given the fact of the special food and alcohol

2    during the shifts, I can assume that those people were

3    offered-- they were asked for sexual advances.

4    Q.  Well, why do you assume that because somebody gets to eat a

5    particular type of food that Mr. Marino propositioned them for

6    sex?

7    A.  Mostly I assume that based on my own experience for the

8    most part and on the knowledge I had from other employees.

9    Q.  And that's it, right?

10   A.  That's enough.

11   Q.  Did you ever observe Mr. Marino have sex with any other

12   employee?

13   A.  Not in the restaurant, no, sir, thank God.

14   Q.  Well, outside the restaurant did you ever observe

15   Mr. Marino have sex with any other employee?

16   A.  I never been outside that restaurant with Mr. Marino

17   anywhere else despite his invitations.

18   Q.  And you said that Izabela Marino was in the restaurant on a

19   fairly regular basis, is that right?

20   A.  As far as I know, they lived upstairs.  She was there a

21   couple of times a week at least, yes.  She was doing our

22   payroll for some reason.

23   Q.  I'm sorry, I didn't hear you.

24   A.  She was in charge of our payroll for some reason.

25   Q.  So on the shifts that you worked, was she usually there?

E4NBMIRT                    Miller – cross

1    A.  Not always.  She would sometimes step in, be there half

2    hour, go away, and maybe come back.

3    Q.  And what about her son?  Was he there?

4    A.  He was there, yeah, sometimes.

5    Q.  And do you know Ms. Marino's nationality?

6    A.  I believe he's Italian, sir.

7    Q.  No, Mrs. Marino.

8    A.  Oh, I'm sorry.  She's Polish to the best of my knowledge.

9    Q.  And do you recall after your termination when it was the

10   first time that you complained to any court that you were

11   sexually harassed?

12   A.  I'm sorry, could you repeat the question?

13           THE COURT:  Wait a minute.  Did she ever claim she was

14   sexually harassed?  Why don't you ask that?

15   Q.  Ms. Zemtsova, did you ever claim that you were sexually

16   harassed by Mr. Marino?

17   A.  I discussed it with my attorney, yes, and then we filed the

18   claim.

19           THE COURT:  I didn't understand the answer.

20           THE WITNESS:  I discussed it with my attorney and then

21   we filed a sexual harassment claim in 2010.

22           THE COURT:  Will the reporter read the answer.

23           (Record read)

24           MR. CESARATTO:  Your Honor, may I approach?

25           THE COURT:  Yes.

1   Q.  Ms. Zemtsova, do you recognize Exhibit 38?

2   A.  Would it be at the end of the document?

3   Q.  Well, do you recognize the first page?

4   A.  Yes, sir.

5   Q.  Is that the first complaint you filed in March 2010?

6   A.  I cannot see the date here.

7   Q.  Well, if you look in the first --

8   A.  Oh, yes.

9   Q.  If you look --

10  A.  Yes.  At the end it says "March 24th, 2010."

11  Q.  And is that the first complaint that you filed against

12  Mr. Marino?

13  A.  Yes.

14  Q.  And could you please read through it and tell me where you

15  see that you alleged that Mr. Marino sexually harassed you?

16  A.  Let me see.  I found the part about my retaliation.  If it

17  was filed in March, it was actually before we filed sexual

18  harassment claims.  So this claim would have only wage claims.

19          MR. CESARATTO:  I have nothing further, your Honor.

20          THE COURT:  All right.

21          MR. KAUPP:  Briefly, your Honor.

22          THE COURT:  All right.

23  REDIRECT EXAMINATION

24  BY MR. KAUPP:

25  Q.  Ms. Miller, you said that you had assumed that Mr. Marino

E4NBMIRT                     Miller - redirect

1    was propositioning other female employees for sex, and counsel

2    asked you what that was based on.  You said on your own

3    experience and the knowledge from other employees, and I want

4    to ask you about that second part.

5           What was your knowledge from other employees about

6    Mr. Marino sexually propositioning them?

7           MR. CESARATTO:  Objection; hearsay, your Honor.

8           THE COURT:  Sustained.

9           MR. KAUPP:  It goes to her state of mind, your Honor.

10   No?  I have nothing further.

11          THE COURT:  The objection is sustained.

12          MR. KAUPP:  I have nothing further.

13          THE COURT:  You may step down.  Thank you.

14          (Witness excused)

15          MR. KAUPP:  We'd like to resume with the plaintiff,

16   your Honor.

17          THE COURT:  Let's do that.

18    TATIANA MIRONOVA, resumed.

19   DIRECT EXAMINATION (Continued)

20   BY MR. KAUPP:

21   Q.  Tatiana, when we left off, I was beginning to ask you about

22   the reality show.

23          I want to know, when did you first learn about a

24   reality show at DaMarino's?

25   A.  Well, like I already said, they were doing the first part

1   of a show, like a short version.  And that when I got-- you

2   know, they film me.  He filmed me.  When I was walking on the

3   side, he asked me, he told me, you know, walk and-- basically

4   walk, grin me, and that's it.

5   Q.  Okay.  And you were filmed at some point?

6   A.  Yeah.

7   Q.  Okay.

8   A.  And I agreed.

9   Q.  And do you remember when you were filmed?

10  A.  Right in the beginning of my employment.

11  Q.  And --

12          THE COURT:  When was it, please?

13          THE WITNESS:  Like maybe first week of my employment.

14          THE COURT:  First week of March?

15          THE WITNESS:  No, no.  First week of September 2009.

16          THE COURT:  Oh, 2009.  All right.

17  Q.  And where were you filmed?

18  A.  Outside on the sidewalk.

19  Q.  And did anybody talk to you about what the filming-- what

20  the scene was going to show?

21  A.  Well, how it happened is I was coming to work and it was

22  completely spontaneous.  So I saw they are on, you know-- they

23  were-- I knew that they were filming just in general, but I

24  didn't know that they were going to film that day.

25          So when I was walking, you know, he asked me to, you

1    know, participate and I gladly agreed.

2    BY THE COURT:

3    Q.  Okay.  And how long had you been working at the restaurant

4    at that point?

5    A.  Like I said, probably like first week.  First week.

6    Q.  Okay.

7    A.  I don't recall specific dates.

8    Q.  Okay.  I have some clips I'd like to show, but they're not

9    queued up so we'll get back to that later.

10          Did there come another time after September of 2009

11   when there was more filming for the reality show?

12   A.  Yes.

13   Q.  When was that?

14   A.  I think it was after the Wilson case was filed, and he

15   didn't want Gen Wilson on his show.  And he want to create,

16   like, a drama.  He said that drama attracts the customers.  He

17   wanted to create something like a Housewives so that people

18   would watch and he would send it to Hollywood.

19   Q.  Did he tell you that?  Did Mr. Marino tell you that?

20   A.  Yeah.  Well, at DaMarino there were plenty of drama.

21   Q.  Okay.  And can you give me a month of 2010 that the filming

22   happened approximately?

23   A.  Well, probably April.

24   Q.  Okay.  And what filming took place in April?

25   A.  Well, they hand me some script.  They told me few lines

1    that I have to say.  But he told me "Please say something nice

2    about me."

3              THE COURT:  I'm not understanding what you're saying.

4    What happened?  Was there filming in April of 2010?

5              THE WITNESS:  Uh-huh.

6              THE COURT:  And what happened in that filming?

7              THE WITNESS:  Well, basically I was giving an

8    interview.

9              THE COURT:  You were being what?

10             THE WITNESS:  Interviewed.

11             THE COURT:  You were being interviewed?

12             THE WITNESS:  Yeah.

13   Q.  Prior to the interview, what did Mr. Marino tell you?

14   A.  He asked me to say something nice.

15   Q.  About?

16   A.  About him.

17   Q.  Okay.  And did you?

18   A.  Yes, I did.

19   Q.  And who else was there for the filming?

20   A.  That's happened during the shift and everybody who worked

21   were filmed.

22   Q.  Did you meet any of the people that were making the film?

23   A.  Yes.  They were directly-- they were the ones who were

24   interviewing me.

25   Q.  And did they tell you anything about what the scene would

1    show?

2    A.   They said that they want drama.

3            THE COURT:  They said what?

4            THE WITNESS:  They want drama.  Drama.  They explain

5    me in general what is the show was about, and they told me in

6    general what I supposed to say, but then I had to improvise.

7            MR. KAUPP:  Okay.  I'd like to play a clip from this

8    April 2010 filming, your Honor.

9            THE COURT:  All right.

10            (Pause)

11            THE COURT:  Is that it?

12            MR. KAUPP:  We're still trying to queue it up, your

13    Honor.

14            THE COURT:  Does the clip just simply show her?

15            MR. KAUPP:  It shows her being filmed and it shows

16    what she's saying about the restaurant.

17            THE COURT:  Could we pass that?

18            MR. KAUPP:  We certainly can, your Honor, at least for

19    the moment.

20            THE COURT:  Last time--

21            MR. KAUPP:  All right.

22            THE COURT:  -- when she was testifying we had gotten

23    to March 2010.

24            MR. KAUPP:  And now we're in April 2010, your Honor.

25            THE COURT:  All right.

1              MR. KAUPP:  We're moving along.  I promise.

2        BY MR. KAUPP:

3        Q.  How many days of filming were there?

4        A.  One.

5        Q.  Okay.  At this period of time, in April of 2010, how was

6        Mr. Marino treating you?

7        A.  Well, he was still sexually harassing me.

8              THE COURT:  He was what?

9              THE WITNESS:  He sexually harassing me.

10       Q.  Can you describe exactly what?

11       A.  Okay.  He whispered in my ear by grabbing--

12             THE COURT:  He what?

13       A.  He whispered in my ear.  He grabbed my neck and I had to

14       bend over and his lips will touch my ear.  He would try to--

15       oh, if you see the bar, if you look at the bar -- if you can

16       show the picture, please.  The place is very, very-- you know,

17       it's tight.  So he would go around me.  He would go behind me

18       and he would put his hands on my-- on my waist.  And he would

19       just like-- I would move out, but he would constantly do that.

20             THE COURT:  He was putting his arms on your waist.

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.

23       A.  He would go behind me, especially where the places where

24       they have ice machine and it's in the middle.  And especially

25       when I talk to-- especially when I talk to the customers and I

1   have nowhere -- I'm in the middle of a conversation and I have

2   no opportunity to move.  He would go, pass by, like he needs

3   something in the liquor room, the beer room, and he-- oh, the

4   lights.  The lights were next to the beer room.  So he would go

5   there and he would adjust the lights.  And while he going

6   there, he would touch me.  He would touch me on my waist.

7   Q.  Did he touch you anywhere else at this time, during this

8   time period?

9   A.  Well, I was doing my best to avoid it.  I don't think so.

10  Q.  Okay.  Now, at the end of May 2010, you were tending bar

11  one night, right?

12  A.  Yes.

13  Q.  Okay.  And do the bartenders stay later than the other

14  employees, the waiters?

15  A.  We are.  The servers, they leave at 10, 10:30 sometimes.

16  They count their tips, they fill out the tip book, and then

17  they leave and I stay till close.

18  Q.  Does the bar close later than the dinner service?

19  A.  Yeah.  I'm sorry, I'm just getting-- I don't feel good.

20  Q.  I know that you're anticipating where I'm going and I

21  understand you're uncomfortable.  So take your time and go

22  slow.

23  A.  One second.

24  Q.  Here's my question.

25  A.  Okay.

1   Q.  Did the bar stay open later than the restaurant service for

2   food typically?

3   A.  Yes.

4   Q.  Okay.

5   A.  Until the last customer leaves.

6   Q.  And how late would you typically finish serving customers

7   on a Friday or Saturday?

8   A.  On a Friday/Saturday, 1 and 2 a.m.

9   Q.  Okay.  And can you tell us what happened one night late in

10  May of 2010?

11  A.  Okay.

12  Q.  Did you end up staying later than you normally would?

13  A.  Yes.

14  Q.  Why?

15  A.  He asked me to do stuff that they usually don't do.

16  Q.  For example, what was he asking you?

17  A.  For example, we had glasses on top, wine glasses, and we

18  had the shelves was bottles.  So he asked me to clean it, which

19  I never clean.  He would ask me to take the bottles down and

20  clean the mirror behind --

21  Q.  Slow down.  Slow down.  He would ask you to take what

22  down?

23  A.  The bottles of liquor on the shelf and wipe the mirror

24  behind it.  And he didn't let me close because I --

25            THE COURT:  He didn't what?

1          THE WITNESS:  He didn't let me close the register.

2          THE COURT:  Okay.

3   Q.  Did he ordinarily ask you to do these things?

4   A.  Cleaning, no.

5   Q.  Okay.  And so what time do you think it was when you

6   finally got done with all these side tasks that he asked you to

7   do?

8   A.  Well, at the time we usually close, like, weekdays is 12

9   and Friday/Saturday 1.

10  Q.  And when you were finished, did you then cash out the

11  register?

12  A.  Yes.  You have to-- you have to count all the cash and the

13  credit cards and you have to pool everything together in an

14  envelope and bring it to the office.

15  Q.  And did you notice if anybody else was in the restaurant

16  with you when you closed out the cash register?

17  A.  Well, that day, no, because everybody left early,

18  especially usually-- I don't know Rahim is staying because he's

19  locking the restaurant or Marino is locking the restaurant

20  himself.  Where he is, I don't really pay attention what other

21  people do because I had a lot of responsibilities on my

22  shoulders.

23  Q.  Okay.  Slow down.  Just take it easy.

24          You're saying that ordinarily Rahim would stay later

25  also?

1    A.   Yes.

2    Q.   Okay.  Did you see him there that night?

3    A.   No.

4    Q.   Okay.  What are you supposed to do after you cash out the

5    register?

6    A.   I have to count the money and then bring it to, an

7    envelope, to the office.

8    Q.   And did you count out the money and put it in the envelope

9    this night?

10   A.   Yes.

11   Q.   And then what did you do?

12   A.   Well, I was already, you know, preparing to leave.  And I

13   didn't realize that-- I don't remember that day Marino is in

14   the office.  And I went to the office and I opened the door --

15   Q.   Why did you go to the office?

16   A.   I had to drop the money to the box.

17   Q.   And where did you put the money in the office?

18   A.   I put the money in the box.

19   Q.   And did you do that this night?

20   A.   Yes, I did.

21   Q.   Okay.  Please describe entering the office.

22   A.   Well, it depends if somebody's sitting blocking the door or

23   somebody is sitting in front --

24   Q.   On this night.

25   A.   On that night?  Well, he was sitting and blocking the door

1    and I had to squeeze.  And they have a pipe and I had to-- I

2    have to walk-- when you walk in, I have to bang, kind of, and

3    squeeze between the chair and the door.  And then --

4    Q.  Hold on one minute.  You referred to a pipe.  I'm going to

5    mark another exhibit.

6            MR. KAUPP:  I'm showing counsel 52G, Plaintiff's.

7            MR. CESARATTO:  No objection.

8    Q.  Is this the office?  Yes?

9    A.  Yes.

10   Q.  And is this the pipe you were talking about?

11   A.  Yes, it is.

12   Q.  And is this how it looked on that night, more or less?

13   A.  More or less.  Different chairs.

14           MR. KAUPP:  I'd like to offer 52G into evidence.

15           THE COURT:  Received.

16           (Plaintiff's Exhibit 52G received)

17           MR. KAUPP:  Thank you.

18   A.  And if you look at --

19           THE COURT:  Wait until your counsel gets that.

20           Now, what's your question now?

21           MR. KAUPP:  I'm sorry, your Honor.  That's not on.

22   Perhaps I could just show it to the jury.

23   Q.  This picture has the pipe you were describing on the night

24   of the event, is that right?

25   A.  Yes.

1    Q.  Okay.  So you bent under the pipe and you entered the

2    office and squeezed by Mr. Marino.  Then what happened?

3    A.  Well, I had to get to the box.  So I dropped the money and

4    he invited me to-- he wanted to talk to me.

5    Q.  What did he say to you?

6    A.  "I want to talk to you.  I want to talk to you.  Sit down.

7    Tatiana, sit down, I want to talk to you."

8    Q.  And did you sit down?

9    A.  Well, yeah.  I polite person.  I'm not-- you know, I didn't

10   expect nothing.

11   Q.  When you sat down, what did you think was going to happen?

12   A.  Well, I-- I-- I-- well, what I thought was that he-- so

13   he's going to do the same that he does, you know, during the

14   shift.  He would talk to me, he would tell me his stories

15   about-- or he would complain about his wife as usual.

16   Q.  And what did he do or say next after you sat down?

17   A.  Well, he started with complaining about his wife.

18   Q.  What did he say about his wife?

19   A.  He said that he hates his wife and he hates that he can't

20   eat burgers every day.  Sometimes he needs pasta.

21   Q.  And then after he said that, what happened?

22   A.  And then he start-- well, he started I'm very beautiful and

23   how much he loves me.

24   Q.  Okay.  And then what happened?

25   A.  He put his-- he put his arm on my knee.

1    Q.  His arm?  His arm on your knee?

2              THE COURT:  Why don't you let her testify.

3              MR. KAUPP:  Okay.  Okay.

4    Q.  Go ahead.

5    A.  He put his-- I don't know, his-- put his --

6    Q.  Hand?

7    A.  He put his hand on my knee.  He went inside of my thigh.

8              THE COURT:  He what?

9              THE WITNESS:  He went inside of my-- like, he went

10   under my dress.

11   A.  And then I said, "What are you doing?"  And I stood up.  I

12   stood up and then --

13             THE COURT:  And then what?

14   A.  And then he said, "Oh, Tatiana" -- because we have monitors

15   right behind me.  He said, "I was watching you on the monitors

16   while you work and I was masturbating."

17   Q.  Stop right there because I want to make-- I know you turned

18   to the judge.

19             MR. KAUPP:  I just want to make sure the jury's also

20   hearing the witness, your Honor, because she's facing you.

21             Is the jury hearing the witness?

22             JURY:  Yes.

23   Q.  So he said to you he's watching the monitors and he's

24   watching you on the monitors and masturbating.

25   A.  Yes.

1    Q.  Then what?

2    A.  And then-- and then-- I'm sorry.

3    Q.  It's okay.  Take it slow.

4    A.  Oh, and he said that he wants to do it-- he said, I want--

5    and I was scared.  I said, "I don't want to have sex with you."

6    And he said, "I'm not going to have sex with you.  I just

7    wanted you to be there while I masturbate."

8    Q.  And then what happened?

9    A.  I tried to leave and he wouldn't let me, because he blocked

10   the door with his chair.  And then he said that I love-- he

11   kept saying that "I love you" and --

12   Q.  Were you facing him?

13   A.  Yes.  And then --

14   Q.  And then what happened?

15   A.  He was unzipping his pants.  And then I turned back --

16   Q.  You turned your back to him?

17   A.  Uh-huh.

18   Q.  And how were you standing?

19   A.  Facing the monitors.

20   Q.  Okay.  And then what happened?

21   A.  And then-- and then he unzipped my dress and then he put

22   his hand-- he unzipped my dress.  He put his hands on my dress

23   and he went-- and he went down.  And he-- and then some-- I

24   don't know why --

25   Q.  What do you remember happening next?

1  A.  I don't remember.  It was, like, a blackout.  Like,

2  everything-- I couldn't-- I thought it's forever, but, I don't

3  know, I don't-- I heard the noises.

4  Q.  What did you hear?  What kind of noises?

5  A.  I don't know.  I don't know if I want to describe them.  I

6  don't know if I can describe because --

7  Q.  Did you hear him masturbating?

8  A.  I heard him masturbating and then I felt that he came on my

9  back.

10  Q.  He ejaculated on your back?

11  A.  (Indicating).

12  Q.  And then what happened?

13  A.  And then he said that I can go.

14  Q.  Did he say anything else to you?

15  A.  No.

16  Q.  And then what did you do?

17  A.  He said-- I'm sorry.

18  Q.  That's okay.  I know you're nervous and you're upset.

19  A.  I just feel dizzy.

20        MR. CESARATTO:  Your Honor, I would just object to the

21  narrative from counsel.

22        THE COURT:  Please, please, please.

23        THE WITNESS:  I'm just sorry.  I never-- I never felt

24  dizzy like that.  Right now I'm very unusual.

25        THE COURT:  Take it easy.  What happened after that?

1   What happened after that?

2           THE WITNESS:  I just feel different than I felt like

3   before.  I just feel-- I feel like I'm very --

4   Q.  Do you need to take a break?

5           MR. KAUPP:  Your Honor, perhaps --

6   A.  No, it's just very strange for me.  It doesn't-- okay.

7   I'll just continue.

8   Q.  All right.

9           THE COURT:  Can I just ask you this:  Did you leave

10  then?

11          THE WITNESS:  I did leave then.  He let me go.

12          THE COURT:  You what?

13          THE WITNESS:  He let me go.

14          THE COURT:  He let you go.  All right.

15          MR. KAUPP:  Your Honor, I think she was going to

16  say --

17          THE COURT:  All right.  We'll take a break now.  We'll

18  take a break.

19          MR. KAUPP:  Thank you.

20          (Recess)

21          (In open court; jury present)

22          MR. KAUPP:  Thank you for the break, your Honor.

23  BY MR. KAUPP:

24  Q.  Tatiana, I'm going to ask you -- I know this is emotional,

25  but I need verbal answers from you.  And, unfortunately, I

1    found out during the break that when I asked you a very

2    important question, you nodded your head.  You didn't give me a

3    verbal answer.  I have to re-ask the question.

4              Did Mr. Marino ejaculate on your back?

5    A.  He did.

6    Q.  Thank you.

7              Now, I had asked you what he said to you before you

8    left the room and you started to indicate that you remembered

9    something.

10             Was there anything else he said to you before he moved

11   aside and you left the room?

12   A.  He did.  He said that I'm an immigrant and --

13             THE COURT:  He said what?

14             THE WITNESS:  He said that I'm an immigrant.

15             MR. KAUPP:  "I'm an immigrant," your Honor.

16   A.  That I have no rights.  He said that he will tell my

17   husband that I'm a prostitute.  And he said I would have no

18   idea how embarrassing in Russia, how-- it's horrible in Russia.

19   Anybody-- if something like that happened to you, people judge

20   you because-- because-- you know, that's your fault that you're

21   in that situation.  That's mean you allow that.

22   Q.  Okay.

23   A.  And you go-- even if you go to police, whoever has more

24   money, you know, will win.  Nobody cares about people.

25   Q.  Slow down.  Slow down.

1              Before the break you mentioned you were dizzy.  Can

2    you please clarify?  Were you talking about as you sit there on

3    the witness stand or on the night that this was happening?

4              THE COURT:  What was the question again?

5              MR. KAUPP:  She testified she was dizzy, and I don't

6    know if she was indicating while she's sitting here today or

7    the night in question.

8    A.  I indicated that I felt dizzy today when you-- when you--

9    when you were approaching the question.  And I actually never

10   felt like that.  I felt like I hear my voice louder.

11   Everything was again.  When you said this night in May, I felt

12   that I hear my voice louder than-- than it is.  I don't know

13   how to describe that.

14   Q.  And then you also said it was like a blackout.

15             Can you tell me, were you referring to today or on the

16   night?

17   A.  No, I-- I-- on the night.

18   Q.  On the night.  Okay.

19             But then you testified to some things that happened.

20   Do you recall those things happening?

21   A.  Yes.

22   Q.  Okay.  You didn't black out those parts?

23   A.  No.

24   Q.  Okay.  After Mr. Marino moved aside and said those things

25   to you, then what happened?

1   A.  When he said that-- he said it and he said that he's going

2   to come up to my husband's mother, my mother-in-law, and he

3   would go and tell them that I'm a prostitute.  And I have to

4   keep my mouth shut.  And then he, you know, he said that

5   everything's going to be okay and, you know, I can go.

6   Q.  Okay.  And were you scared?

7   A.  Of course.

8   Q.  And were you --

9   A.  I was scared for him telling my husband something.

10  Q.  Why were you scared of him telling your husband something

11  like that?

12  A.  Because my husband will leave me.  My husband-- well, I

13  don't know if he would-- he didn't leave me at the end, you

14  know, but in Russia, that's how-- that's how-- if the husband

15  finds out that some other man had something sexual with his

16  wife or girlfriend, automatically, you know, it ruins the

17  relationship.

18  Q.  Did you hear about that growing up in Russia?

19  A.  That's-- that's very-- yes.

20  Q.  Okay.

21  A.  Not only hearing.  I saw people.

22  Q.  Going back to that night, what happened when he moved

23  aside?

24          THE COURT:  What happened when?

25  Q.  When Mr. Marino moved aside, what happened?

1   A.  Well, when he moved aside, I went to the bathroom and I

2   changed.

3   Q.  And what did you change?

4        THE COURT:  You what?

5   A.  I ran to the bathroom and I changed in my regular clothes.

6   Because I come to work usually in jeans and, like, a jacket or

7   sweater, and I work in a dress.  So I -- you know, I couldn't

8   go outside wanting him -- you know, so I went to change.  And I

9   just ran to the bathroom and then I left.

10  Q.  Did Mr. Marino also ejaculate on your dress?

11  A.  Yes, he did.

12  Q.  Okay.  And did you say you left the restaurant?

13  A.  I did.

14  Q.  And where did you go?

15  A.  Well, initially I had to go to my husband's house, because

16  at that time we did not live together.  We live partially with

17  his father-in-law and mother-in-law and partially I had my own

18  apartment with my roommate.

19  Q.  And where was your apartment with your roommate?

20  A.  In Brooklyn on Benson.

21  Q.  Where?

22  A.  In Benson.

23  Q.  Bensonhurst?

24  A.  Bensonhurst.

25  Q.  And why weren't you staying with your husband at his mother

1    and stepfather's house?

2    A.   Because his father-in-law, he doesn't like the house to be

3    dorm.  He said...

4    Q.   Take your time.  Did you say he didn't like his house to be

5    like a dorm?

6    A.   Yes.  He doesn't like a lot of people in the house and

7    that's why we had to live in different places.  Either when I

8    come on the weekend, he'll leave.  I stay with my husband and

9    my husband in-laws and even my husband comes with me and stays

10   with me and my roommate.

11   Q.   And on this night were you supposed to stay with your

12   husband?

13   A.   Yes.  And if my father-in-law will find out something like

14   that, you know, that's-- he will be the first-- he first one

15   who say leave her.  I couldn't take a chance that Mr. Marino

16   will go and tell my husband that I'm a prostitute or do

17   something like that.

18   Q.   Did you go stay with your husband that night?

19   A.   No.

20   Q.   I'm sorry?  What did you say?

21   A.   No.  No.

22   Q.   Okay.

23   A.   Give me a second, please.

24   Q.   Where did you stay?

25   A.   I stayed with my roommate.

1    Q.  What roommate?

2    A.  Veronica Arleanskaya.

3    Q.  Can you spell her last name?  Or we can get the spelling

4    later.

5            What did you tell your husband why you weren't staying

6    with him?  Well, strike that.

7            Did you-- did you tell your husband that you weren't

8    going to stay with him that night?

9    A.  Yes.

10   Q.  When did you do that?

11   A.  Like, later that night.

12   Q.  Okay.  And do you recall what you told him?

13   A.  I'm staying at Veronica's.

14   Q.  And did you ask Veronica if you could come stay?

15   A.  No, I could just come.  I live there.  I could just come

16   myself.

17   Q.  And did you see Veronica that night?

18   A.  Yeah, of course.

19   Q.  Did you talk to her about what happened?

20   A.  Well, she saw that something wrong, but I just said that I

21   had a fight with Roman.

22   Q.  And Roman's your husband?

23   A.  Roman's my husband.

24   Q.  Okay.  And that was it?  You didn't talk to her about

25   anything else that happened?  You just said there was a fight

1   with Roman?

2   A.  Yes, just-- I just didn't want to talk.  Like, I was-- I

3   just-- I couldn't-- it's very hard to describe.

4   Q.  You didn't tell Ms. Arleanskaya what happened?

5   A.  No, of course not.  I wouldn't tell anybody.  She would

6   tell somebody else and then somebody else would tell my in-- I

7   keep my private life private.

8   Q.  Were you supposed to work the next day?

9   A.  No.

10  Q.  Okay.  Did you have the next few days off?

11  A.  Well, I think it was either I was working either Friday or

12  Saturday and Marino called me and he asked me if I'm coming

13  back.  And he said that he want-- he won't tell anything, but I

14  have to come back.

15  Q.  He said I won't tell anything but you have to come back?

16  A.  Yeah.  He said that "I love you.  Please come back."

17  Q.  And prior to his call, what were you thinking you were

18  going to do?

19  A.  I didn't think anything.  I was panicking.  I was scared.

20  I was very scared.  I didn't know-- I didn't know what's going

21  to happen.

22  Q.  And then after he called you, what did you think?

23  A.  That it's better to just-- it's better just do what he

24  says.  And he said that he's not gonna-- oh, he said he's not

25  gonna touch me anymore.  So I thought that, you know, if he

 1  said that, then he won't and I won't have to deal-- I won't

 2  have to tell my husband anything.

 3  Q.  So you returned to work?

 4  A.  The next week.

 5  Q.  The next week?

 6  A.  Like, in five days.

 7  Q.  Okay.  And then after you returned to work, what were

 8  things like for you?

 9  A.  It was different.

10  Q.  How was it different?

11  A.  He was not harassing me.

12          THE COURT:  He was what?

13  A.  He was not doing what he usually does.  He was very-- he

14  greeted me as a family member.  But he-- he kind of told

15  everybody that I'm a family.  He made my-- he made me family.

16  Like, special.  His family.  Like, he gave me privileges, that

17  I can eat some extra food.  But he's-- you know, the first

18  thing he said, "Don't worry, nothing gonna happen."  You know,

19  when I just walked in, "Nothing gonna happen."

20  Q.  That's the first thing he said when you returned to work?

21  A.  Yes.  And I just-- when I looked at him, I saw that-- you

22  know, I just felt safer.  I just decided for myself that I just

23  forget and that's never happen.

24  Q.  And he gave you some special privileges.  What were

25  those --

1           MR. CESARATTO:  Objection, your Honor.  It's leading.

2           MR. KAUPP:  I'm following up on her testimony to ask

3   what privileges she's referring to.

4           THE COURT:  Objection is overruled.

5   Q.  What privileges were you referring to?

6   A.  Well, he-- usually the waiters can eat, like, soup or

7   salad.  And I ate-- anything I order, like something extra

8   sometimes.  Like, not extra, but instead of plain chicken soup,

9   I ordered, like, sratella or different pasta.

10  Q.  Anything else change in terms of privileges?

11  A.  Well, I don't know.  I felt like he trust me more.

12  Q.  Okay.  And then after-- after a period of time, did

13  something happen that summer?

14  A.  Yes, I got in a car accident.

15  Q.  And when did you get into a car accident?

16  A.  On July 20.

17  Q.  Okay.  And do you recall what injuries you sustained in the

18  car accident?

19  A.  Yes.  I hurt my shoulder and my neck.

20  Q.  Okay.  And do you recall getting an MRI report?

21  A.  Yes, I did.

22  Q.  And do you recall what the MRI report showed?

23          MR. CESARATTO:  Objection, your Honor.  Hearsay.

24  A.  No, I --

25          THE COURT:  Overruled.

1    A.  I don't remember what the MRI said.

2    Q.  Your doctor told you what it said?

3    A.  Yes, the doctor did the different proceeding.

4    Q.  I'd like to refer you-- is there something you can look at

5    that would refresh your recollection?

6    A.  Of course.

7    Q.  Okay.

8    A.  My medical records.

9    Q.  Would you please look at the white trial binder in front of

10   you and turn to Exhibit Tab 40?  I'll refer you down to the

11   first page under "Previous testing, MRI of the cervical spine."

12   Would you read that paragraph, please, to yourself?

13   A.  Which one?

14          MR. KAUPP:  May I approach, your Honor?

15   Q.  Under "Previous testing," just read this paragraph, please,

16   to yourself.

17   A.  Okay.  Well, it's medical terms.  Even if I read, I don't

18   understand.

19   Q.  Do you remember being diagnosed with disk bulges?

20   A.  Yes, of course.

21   Q.  Okay.  In your neck it's C2-3 and C3-4?

22   A.  I'm sorry, I'm not following.  What did you say?

23   Q.  Do you recall being diagnosed with disk bulges at the C2-3

24   and C3-4 locations?

25   A.  If it says here, that's yes.

1    Q.  Okay.  And do you recall being diagnosed with a herniated

2    disk at C5-6?

3    A.  Yes.

4    Q.  And disk herniation at T5-6?

5    A.  If I-- like I said, if it's medical record and it's

6    occurred, then it's like that.

7    Q.  Okay.

8    A.  Yes.

9    Q.  And a cord abutment at C5-6?

10   A.  Yes.

11   Q.  And disk herniation at L3-4?

12   A.  Yes.

13   Q.  And disk bulge at L5/S1?

14   A.  Yes.

15   Q.  Were you pretty hurt after that accident, Tatiana?

16   A.  I was.

17   Q.  Could you work?

18   A.  No.  My doctor said that I only would be able to recover in

19   a year and a half.

20   Q.  And were you in pain?

21   A.  I was in pain.  I couldn't --

22   Q.  What kind of pain were you in?  Please describe it for the

23   jury.

24   A.  Well, it's a shooting pain in my, you know, neck and

25   shoulder.  And it was, like, very, very-- I don't-- the word

1   just not coming to my-- was tough.  Was tough, but mostly

2   shooting pain.  And if I picked up something, it hurts.

3   Q.  And were you able to do your duties as a bartender at that

4   point?

5   A.  Of course not.  I wasn't even allowed to drive.

6   Q.  Did you sue anybody for that accident?

7   A.  No, I didn't.

8   Q.  Did you-- did you receive some disability pay?

9   A.  I did.  I was rear-ended by MTA bus.  I was standing and he

10  hit my car.

11  Q.  And you were driving your car?

12  A.  I was standing-- I was just standing-- I was double-parked,

13  but, you know, he was going fast and I guess he couldn't

14  maneuver and he hit my car.

15  Q.  Okay.  And were you out of work for some period of time?

16  A.  For a month and a half.

17  Q.  And while you were out of work, did Mr. Marino contact you?

18  A.  He did.  Well, when I got in the accident, he start calling

19  me and he was talking about reality show and that he is gonna

20  make me star.  And he ask me to come, to come by.  And he ask

21  how I felt, you know.  Some general questions.

22  Q.  How often was he calling you?

23  A.  Well, he call me, like, three times after that.  You know,

24  my husband was asking me why he's calling you.  You know, I

25  said he's concerned.

1   Q.   Okay.

2   A.   And I went to DaMarino's with neck brace to show that I'm

3   hurt and I can't work, because he was -- I don't know, maybe--

4   I just-- always been in back of my mind that he may think that

5   I'm trying to leave and he'll go and tell something to my

6   husband.  Because he said something-- he asked something about

7   my husband and he never ask about my husband and that's

8   automatically ring the bell for me.

9   Q.   Were you concerned that your husband was asking you why

10  Mr. Marino was calling?

11  A.   Well, that's what normal people do.  Men calls you and men

12  don't call me.

13  Q.   What number was he calling you from?

14  A.   Some unknown number.

15  Q.   Why --

16  A.   I think once he called from his cell phone.  Once.  Because

17  I saw the number and I picked up, but the rest of the time he

18  called from unknown number.

19  Q.   And so you went to work and after you-- you went to work

20  hurt because he was calling you.  Is that what you said?

21  A.   Yeah.  I took a train.  The office that I had physical

22  therapy and chiropractor, it was in Manhattan, like a few stops

23  from DaMarino's.  So I decided to take two stops and show that

24  I'm hurt.

25  Q.   To show that you were hurt?

1   A.  Yes.

2   Q.  And then after you showed him you were hurt, did the calls

3   stop?

4   A.  Yeah, the calls stopped and-- the calls stopped.

5   Q.  Okay.  And then at some point did he contact you again?

6   A.  He did.  He send me Facebook message.  "Bella."

7   Q.  Okay.

8   A.  I think I posted, like, I don't know, maybe some pictures

9   on Facebook.  It was some activities.  Usually I don't-- I

10  don't-- I don't use Facebook much.  I don't like public, you

11  know, to participate in my private life.

12  Q.  Okay.  I'm going to ask you to look at Trial Exhibit 31,

13  please.

14          Do you recognize what that is?

15  A.  Yes, that's Marino's Facebook message to me.

16  Q.  Okay.  And did you receive that on or around September

17  23rd, 2010?

18  A.  Yes.

19  Q.  Okay.  And is that an accurate depiction of it?

20  A.  Yeah, that's what it...

21  Q.  Okay.

22          MR. KAUPP:  Your Honor, at this time I'd ask to move

23  Plaintiff's Trial Exhibit 31 into evidence.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 31 received)

1          MR. KAUPP:  May I publish it to the jury, your

2    Honor?

3          THE COURT:  Certainly.

4    Q.  That's the message that you see on the screen?

5    A.  Yes, it is.

6          JURY:  It's flashing.  It's not maintaining.  Now it

7    is.  No, it's not.  It's flashing on and off.  See?  It's off

8    and then on and then off and then on.

9          MR. KAUPP:  Is yours also flashing?

10          JURY:  Yes.  They're all flashing.

11          MR. KAUPP:  Maybe I can rotate that.

12          THE DEPUTY CLERK:  Jon's on his way to see if he can

13    fix it.

14          (Pause)

15          THE COURT:  I really question why we have to get into

16    detail about the injuries from the accident.

17          MR. KAUPP:  We're past the injuries, your Honor.

18          THE COURT:  All right.  Where are we now?

19          MR. KAUPP:  This is after he contacted her and called

20    her a number of --

21          THE COURT:  Oh, that's right.

22          MR. KAUPP:  And then she showed him she was hurt and

23    it stopped, and then after a while he contacted her through

24    this.

25          THE COURT:  All right.  All right.

1    BY MR. KAUPP:

2    Q.  And then after you got this text message-- was this a

3    Facebook message?

4    A.  Yes.

5    Q.  Okay.  And September 23rd --

6              MR. KAUPP:  Is it resolved?

7              JURY:  It's flashing, but we see the big screen.

8              THE DEPUTY CLERK:  What's the problem?

9              THE COURT:  Let's go ahead with the testimony.  Finish

10   the day.

11   Q.  So September 23rd you received this, and then what happened

12   after he contacted you through this Facebook message?

13   A.  I think he followed up with a call.  He asked me to--

14   again, he mentioned the reality show; that he said that he

15   already sent the video and he needs to re-- you know, make

16   another series or something like that.  And he asked me to come

17   to the restaurant for, you know-- he asked me when I coming to

18   work.

19   Q.  Okay.  And he asked you when you were coming to work and --

20   A.  Well, because I didn't work-- because I didn't work all

21   this time and the disability that I was receiving was-- like,

22   it was really pennies.  I probably could have just pay the

23   Metro card.  And I used my savings later on.  It wasn't much.

24             THE COURT:  Do we have anything at the end of the day?

25             THE DEPUTY CLERK:  Yes, your Honor.  We have a

1   supervised release.

2            MR. KAUPP:  We can stop here, your Honor.

3            THE COURT:  No, no.

4   Q.  So you said at that point you had exhausted your savings,

5   disability was pennies --

6   A.  And my husband wasn't working, too.

7   Q.  He was not working?

8   A.  He was not working.  Everything, like, from the beginning

9   at DaMarino, he was at school.  He was volunteering for EMT.

10  You know, for fire alarm.

11  Q.  EMT?

12  A.  EMT, yeah.  When fire alarm rings, he has to go.  So he

13  was, you know, volunteered and you have to be there on duty all

14  the time.  Doesn't matter what time of the day.  So that wasn't

15  obviously paid, but...

16  Q.  And then Mr. Marino called you?

17  A.  Yeah, Mr. Marino called me.

18  Q.  After the Facebook message?

19  A.  After the Facebook message.

20  Q.  What happened on that phone call?  What did he say?

21  A.  Well, he asked me when I coming back.  Well, I was still

22  injured and I couldn't work, but I had no choice.  And I said

23  that --

24  Q.  Did he tell you he wanted you to come to the restaurant?

25  A.  Yes, he invited me to the restaurant to discuss the

1    schedule.

2    Q.  To discuss your work schedule?

3    A.  Yes.

4    Q.  And did you go?

5    A.  I did.

6    Q.  And when did you go?

7    A.  I think September 30.

8    Q.  Okay.  And what happened when you went to the restaurant?

9    A.  Well, I went to the restaurant and he was outside.  And

10   they had, like, table, table outside.  He was sitting there.

11   And he ask, you know, how I am.  Like, we exchanged some

12   information, what happened during the summer.  And then he

13   was also, like, saying something about Wilson case.  I don't

14   know.

15           Then he said "Go to the office, pick up the schedule."

16   And --

17           THE COURT:  He said what?

18           THE WITNESS:  He said "Go to the office and pick up

19   the schedule."

20           THE COURT:  Okay.

21   Q.  And did you?

22   A.  I went to the office.

23   Q.  Was he with you when you were going to the office?

24   A.  He followed me.  I went for-- I didn't know that he was

25   going to follow me.  I-- first of all, it was middle of a

1   shift.

2   Q.  What time of day was it?

3   A.  It was still sun.  It was sunny.  I don't know what time.

4   Approximately around 4, 4:30 probably.  Just because my

5   physical therapy, it was like around that time.  So I went to

6   the office and I look on the table.

7            THE COURT:  And you what?

8            THE WITNESS:  I was looking on the table.  I was

9   looking for a schedule.  There were no schedule.

10  Q.  In the office?

11  A.  In the office.

12  Q.  Okay.  And then what happened?

13  A.  And then he walk-- you know, it was-- I don't know,

14  probably few seconds passed after he walked behind me.  Because

15  I was looking and then realized that it's not there and he

16  walks in.  And I automatically terrified because, you know,

17  that brought me the picture what happened to me.  I was

18  scared.

19  Q.  When he entered the office, how were you feeling?

20  A.  I was just -- I was just scared.

21  Q.  Okay.  Did he close the door or was the door open?

22  A.  No, he didn't close the door.  You know, he just stood out

23  in the-- stood in the open door, in the crack.  You know,

24  eventually he closed the door, obviously, and he said,

25  "Tatiana, I have something to do for you."  And he pointed out

1   a paper on the table.  And it was just a-- you know, he said I

2   have to sign it or I won't leave the office.

3              THE COURT:  Wait a minute.

4   A.  He said-- he pointed out on the table and it was piece of

5   paper like that, but like at the end, something like that, laid

6   down on a table.  And he said that I have to sign it.

7              And I didn't know what to do.  I ask what it is, and

8   he said "This is just about Yuliya Synyuk."  And, you know, I

9   glanced at that and it was about something describing with

10  Yuliya, her and her boyfriend were running around or something

11  like that.  And he said that, you know, I have to sign it.  And

12  he said I won't leave the office, which I took as a-- he's just

13  gonna do what he promised me, you know, what he's gonna do.

14  Q.  Which was what?

15  A.  Which is all the threats that he promised me when he-- when

16  he masturbated.

17  Q.  You mean tell your husband and your family?

18             MR. CESARATTO:  Objection, your Honor.

19  Q.  Is that what you mean?

20  A.  Yes, that's what I mean.  That's exactly.

21  Q.  Okay.

22  A.  And I signed it.

23  Q.  And what?

24  A.  And I signed it.

25  Q.  And you signed it?

1   A.   Yes.

2   Q.   Okay.

3   A.   And then he said "Come back when you want."

4   Q.   Did you read the whole document before you signed it?

5   A.   No, I did not.

6   Q.   Would you please look in the binder, the defendants'

7   binder, the black binder, at their Exhibit 8, please?  Would

8   you please review that document?

9   A.   Uh-huh.  How do you want me to review that?

10  Q.   Just read it to yourself.  Just look at it.

11  A.   The whole thing?

12  Q.   How many pages is it?

13  A.   Four.

14  Q.   How many pages?

15  A.   Four.

16  Q.   Four pages?  Just look it over and turn to page 4.

17  A.   Okay.

18          (Pause)

19  Q.   And you said that's the document you signed, right?

20  A.   Yes.

21  Q.   Does that appear to be a fair and accurate copy of the

22  document?

23  A.   I think so.

24          MR. KAUPP:  Your Honor, I'd like to move Defendants'

25  Trial Exhibit 8 into evidence.

1          THE COURT:  Received.

2          (Defendants' Exhibit 8 received)

3          MR. KAUPP:  May I publish that to the jury?

4          THE COURT:  You may.

5  Q.  Do you see your signature there at the bottom?

6  A.  I see.

7  Q.  And it's dated September 30, 2010?

8  A.  Yes.

9  Q.  And that was the day you went back to the office?

10  A.  Yes.

11  Q.  Okay.  It says "Woodmere, New York."

12          Were you in Woodmere, New York when you signed

13  this?

14  A.  I used to live there.  That's my father-in-law's house.

15  That is where he lives, yes.

16  Q.  But you were at the restaurant.  Were you at Woodmere--

17  strike that.

18          Were you in Woodmere, New York, when you signed this

19  document?

20  A.  What do you mean?

21  Q.  You signed the document, right?

22  A.  Yes.

23  Q.  Okay.  Where did you sign the document?

24  A.  He forced me to sign that.

25  Q.  Where were you?

1    A.  In the office of, you know, Pasquale Marino.

2    Q.  Okay.  And was this the only page you saw at the time you

3    signed this document?

4    A.  Yes, it is.

5    Q.  Okay.

6    A.  That was.

7    Q.  And you mentioned something here that you noticed it was

8    about Yuliya and her husband?

9    A.  Yes.

10   Q.  Okay.  And --

11   A.  You just want to point out?

12   Q.  Do you see paragraphs 20 and 21?

13   A.  Yes.

14   Q.  And 22 and 23?  Do they refer to Yuliya?

15   A.  Yes.

16   Q.  Now we're going to go to the front of the document, page

17   1.

18            Did you read this first page when you signed the

19   document?

20   A.  No, I didn't.

21   Q.  Paragraph 1 says "I worked at DaMarino's Ristorante

22   Italiano with an address of 220 West 49th Street, New York, New

23   York from September 2009 through July 2010 when I was involved

24   in a car accident."

25            Do you see that paragraph?

1   A.  Yes.

2   Q.  You didn't read that paragraph when you signed this

3   document, is that correct?

4   A.  Yes.

5   Q.  And the same for number 2?

6   A.  I haven't seen this pages number 1, number 2 and number

7   3.

8   Q.  Okay.

9   A.  It's only number 4 was laid out on the table.

10  Q.  Okay.

11  A.  But I was asked that question before --

12  Q.  Let me ask you this:  It says on the very first page, the

13  very first line with your name, "Tatiana Mironova, under the

14  pains and penalties of perjury, declares the following..."

15          You did not read that when you signed this

16  document?

17  A.  I did not read that.

18  Q.  Thank you.

19          THE COURT:  We've got to take a break at a

20  convenient-- is this --

21          MR. KAUPP:  We're very close, your Honor.  Well, you

22  know what?  We can pick up tomorrow with this.  I have more

23  questions.

24          THE COURT:  10:15 tomorrow morning, ladies and

25  gentlemen.

1            MR. KAUPP:  Thank you.

2            (Jury excused)

3            (Trial adjourned to April 24, 2014, at 10:00 a.m.)

```
1                      INDEX OF EXAMINATION

2    Examination of:                            Page

3    TATIANA MIRONOVA

4    Direct By Mr. Kaupp  . . . . . . . . . . . . .52

5    NATALIA MILLER

6    Direct By Mr. Kaupp  . . . . . . . . . . . 150

7    Cross By Mr. Cesaratto . . . . . . . . . . . 170

8    Redirect By Mr. Kaupp  . . . . . . . . . . 180

9    TATIANA MIRONOVA

10   Continued Direct By Mr. Kaupp  . . . . . . . 181

11                      PLAINTIFF EXHIBITS

12   Exhibit No.                             Received

13    52A   . . . . . . . . . . . . . . . . . . .79

14    52C   . . . . . . . . . . . . . . . . . . .81

15    52C   . . . . . . . . . . . . . . . . . . .81

16    52D   . . . . . . . . . . . . . . . . . . 100

17    52E   . . . . . . . . . . . . . . . . . . 110

18    52F   . . . . . . . . . . . . . . . . . . 110

19    52G   . . . . . . . . . . . . . . . . . . 191

20    31   . . . . . . . . . . . . . . . . . . . 210

21                      DEFENDANT EXHIBITS

22   Exhibit No.                             Received

23    3   . . . . . . . . . . . . . . . . . . . .64

24    4   . . . . . . . . . . . . . . . . . . . .66

25    2   . . . . . . . . . . . . . . . . . . . .70
```

223

8     . . . . . . . . . . . . . . . . . . . 218